[Nos. B164418, B167179, B172749. Second Dist., Div. Eight. Jan. 19, 2005.]

THOMAS PERSSON, Plaintiff and Respondent, v.
SMART INVENTIONS, INC., et al., Defendants and Appellants.

1144

**COUNSEL**

Akin Gump Strauss Hauer & Feld, Stephen R. Mick, Robert N. Treiman and Joanna H. Kim for Defendants and Appellants.

Law Offices of James R. Rosen, James R. Rosen and Adela Carrasco for Plaintiff and Respondent.

**OPINION**

**BOLAND, J.—**

## SUMMARY

██ Thomas Persson and Jon Nokes, both 50 percent shareholders in Smart Inventions, Inc., a corporation that marketed household consumer products, entered into a buyout agreement in which the corporation redeemed all of Persson's shares. On the day the agreement was executed, the corporation began test marketing of a product called the Tap Light, which was an instant success and generated millions of dollars in revenue. Persson filed this lawsuit against Nokes and Smart Inventions, asserting claims of fraud and breach of fiduciary duty, among others, and claiming millions of dollars in damages. After extended litigation, Persson obtained a judgment for $306,000 and an award of attorney fees, and Nokes and Smart Inventions filed these appeals. Our conclusions are:

1. Where an agreement is induced by fraud, the trial court has the equitable power to set aside a provision of the contract in which the parties released all unknown claims. The aggrieved party is not required to rescind the contract and return the consideration received in order to sue for fraud.

2. Nokes owed no fiduciary duty to Persson, either by virtue of "de facto partnership" or by voluntarily assuming a fiduciary duty. The rights and obligations of partnership cannot exist contemporaneously with the rights and obligations of shareholders in a corporation, and a confidential relationship giving rise to a fiduciary duty did not otherwise arise during arms-length business negotiations between the parties.

3. The jury verdict awarding damages for fraudulent concealment was supported by the evidence. The contentions that the undisclosed information was not material, that Nokes had no duty to disclose it, and that the concealment did not cause Persson any damages are without merit.

4. Smart Inventions was liable for Nokes's fraudulent concealment under principles of respondeat superior.

5. A joint offer by Nokes and Smart Inventions under Code of Civil Procedure section 998, to allow judgment to be taken against them jointly and severally for $500,000, was valid, even though Smart Inventions had no potential liability on one of Persson's claims.

6. The trial court did not err when it awarded attorney fees to Persson in an amount greater than Persson owed under a contingency fee agreement.

7. Nokes's motion for joinder in Smart Inventions's motion for post-section 998 offer attorney fees was timely filed.

8. The trial court must recalculate certain costs that appear to have been double-counted.

## FACTUAL AND PROCEDURAL BACKGROUND

Thomas Persson and Jon Nokes were the founders and equal shareholders of a corporation which developed, manufactured and marketed household consumer products. Persson and Nokes began the business in 1991 as partners, doing business as Smart Products International. They were extremely successful with their first product, the Smart Mop, which Persson discovered in Sweden. In 1994, with continued success in marketing the mop and other products through infomercials and other means, they incorporated the business as Smart Inventions, Inc. Persson and Nokes were both 50 percent shareholders, directors and officers of Smart Inventions.

While Smart Inventions was a successful corporation, Persson and Nokes were increasingly unhappy with one another, each believing his contributions to the corporation were not fully appreciated by the other. Nokes was President of Smart Inventions and ran the day-to-day activities of the corporation. He perceived a disparity in the amount of time he and Persson, whose primary responsibility was product development, devoted to the business. Nokes thought he deserved an increase in his salary to $1 million annually. Persson disagreed, and also indicated his unhappiness with a working environment in which he felt "disrespected and undermined." Both acknowledged it was "probably time to end the 'partnership' . . . ." In May

1998, they began to consider possible options, including a salary increase for Nokes, a buy-out by one party of the other party's interest, and a formal dissolution of the corporation. Later that month, it was decided that Nokes and Persson would each engage his own counsel. By June 5, 1998, both Persson and Nokes had counsel. The corporation's minutes show Persson and Nokes and their counsel met and agreed that financial information would be gathered from the corporation's controller and its accountant, preparatory to a possible buy-out proposal by Persson following an analysis of the financial information by his experts.

Matters did not progress quickly. Smart Inventions was apparently unable for months to generate the financial information necessary for a valuation of the corporation. Nokes wanted to buy Persson out. At one point, Nokes proposed to do so for $1 million and a royalty payment on certain products, but Persson refused Nokes's offers as insufficient and unfair. No progress occurred during 1998 or during the first five months of 1999.

In June 1999, Nokes renewed his efforts to buy Persson out. By that time, sales of the Smart Mop had declined, and Kmart had notified Smart Inventions it would stop selling the mop. Other products were also near the end of their productive life cycles. Smart Inventions operated at a loss in the first five months of 1999, losing an average of $131,000 per month. Nokes told Persson that he would dissolve the corporation if an agreement could not be reached promptly. The two had a series of long meetings in June, in which Nokes said he would "paint you [Persson] the truest picture possible of where the company is right now." Nokes prepared extensive handwritten analyses of the corporation and its circumstances for Persson, punctuated with financial reports. His reports analyzed product sales and various scenarios for the corporation, including dissolution and possible buyers for the corporation as well as various proposed settlements. Nokes indicated this was not a good time to expect buyers, since the time to sell a corporation is during a successful phase with substantial profits and one or more "hot" new products. The corporation, however, had "no new hit products and [was] losing considerable money each month." In addition to analyses of the corporation's various products, Nokes reported on various deals he had made or was then negotiating with respect to various of the corporation's products, including recent business he had brought in to the corporation. The picture he presented was "even bleaker than [Nokes] tried to convey to [Persson]" a few days earlier. He wrote that the corporation "has been slowly dying, the 'old' products no longer shield us as they have in previous years," and "regardless of any new products the company will still continue to lose money for several months while they are in development," so that "[s]ome harsh medicine is needed now . . . ." A few days later, Nokes suggested reducing the factory workforce by two-thirds, terminating his and Persson's salaries, cutting the salaries of salespeople and factory management by 40 percent minimum and

reducing their work week to three days if necessary. Nokes offered to oversee the downsizing at 50 percent of his salary. By July 8, 1999, Nokes wrote that the corporation "is now in a grim state, even worse than ever, with Walmart canceling the 'Smart Mop' and therefore 90% of our mop business . . . ," and made Persson another offer.

Finally, on July 19, 1999, a term sheet was prepared which reflected the principal terms of the eventual agreement between Persson and Nokes, and under which Persson would be paid $1.4 million for his stock. In addition, for tax reasons, Persson was allowed to invest another $200,000 for additional shares in the corporation (which he did on July 20, 1999), and was to receive that amount in addition to the $1.4 million. Nokes's lawyers prepared a stock redemption agreement which included these terms, and lawyers for each side reviewed, revised and exchanged drafts.

On August 6, 1999, the parties executed the stock redemption agreement, under the terms of which Persson sold and Smart Inventions, Inc., purchased all of Persson's shares in the company for $1.6 million ($1.4 million plus the additional investment).

On the same date Persson sold his shares, August 6, 1999, Smart Inventions began television advertising for the Tap Light, a disc-shaped, battery-operated, touch-activated portable light fixture. Nokes had begun looking at the device as early as April 1999, but did not mention it to Persson. In mid-May 1999, Nokes showed the Tap Light, along with a number of other products, to the Home Shopping Network (HSN), which expressed interest in the product. As a result of HSN's interest, Nokes arranged for the shooting of promotional footage illustrating the Tap Light in use. The footage was produced and hosted in May 1999 by Anthony Sullivan, a Florida-based former HSN host whose services are sought after in the infomercial marketing business. In July 1999, Nokes had further meetings with HSN, and in late July Nokes ordered between three and five thousand units of the Tap Light, and reserved and paid for television air time, setting an air date of August 6, 1999, for the beginning of an advertising campaign for the Tap Light. None of this information was reported to Persson.

The Tap Light was an unmitigated success, as became evident as soon as the results of the August 6, 1999 airing of the Tap Light commercial spot were reported 72 hours later. Smart Inventions eventually sold 18 million Tap Lights, generating millions of dollars in revenues.

In addition to generating huge revenues, the Tap Light generated this litigation. Persson sued Nokes and Smart Inventions on June 19, 2000 alleging, in his third amended complaint, causes of action for fraud and

deceit, negligent misrepresentation, securities fraud, breach of fiduciary duty, declaratory relief and an accounting. Persson sought damages in excess of $10 million, as well as punitive damages. Nokes and Smart Inventions asserted an affirmative defense based on the mutual releases given in the stock redemption agreement. Smart Inventions also filed a contingent cross-complaint against Persson for breach of fiduciary duty as an officer of the corporation, alleging that Persson failed to perform his duties as an officer of Smart Inventions, usurped a corporate opportunity, and engaged in self-dealing in connection with another transaction. The cross-complaint was "contingent" on the possibility that the release in the stock redemption agreement—which Smart Inventions asserted barred all claims—would be deemed inoperative.

After motions for summary adjudication, summary judgment, demurrers and other legal maneuvers, the case was tried to a jury, beginning July 17 and ending August 13, 2002, on theories of fraud, negligent misrepresentation and breach of fiduciary duty. Nokes's motions for nonsuit, asserting lack of materiality of undisclosed information and lack of causation as to the claimed damages, were denied. The jury returned a special verdict on the fraud claims, and made special findings in an advisory verdict on the breach of fiduciary duty claims, concluding in substance as follows:

On the fraud claims, the jury found:

—Nokes made no affirmative misrepresentations;

—Nokes concealed or suppressed material facts, causing damages to Persson of $218,000; and

—Smart Inventions did not conceal or suppress any material fact.

In its advisory findings, the jury concluded:

—Nokes owed Persson a fiduciary duty,

(1) based on Nokes's dominance and control of the operations of Smart Inventions;

(2) because Nokes and Persson failed to follow the formalities of operating a corporation and instead continued to operate Smart Inventions, in fact, as a partnership and to treat one another as partners; and

(3) Nokes voluntarily undertook to act on Persson's behalf as a fiduciary.

—Nokes breached his fiduciary duty to Persson, causing Persson economic damages of $256,000 and noneconomic damages of $50,000.

—Persson breached the fiduciary duty he owed to Smart Inventions, but the breach caused no damage to Smart Inventions.

The trial court adopted the jury's special findings that Nokes owed a fiduciary duty to Persson and breached that duty, on the basis of a de facto partnership and Nokes's voluntary assumption of a fiduciary duty,[1] and adopted the damages findings as well. The court rejected the notion of a fiduciary duty based on Nokes's dominance of the operations of Smart Inventions, and also found that Persson did not breach the fiduciary duty he owed to the corporation.

Judgment was entered (a) in favor of Persson and against Nokes, in the sum of $306,000, (b) in favor of Smart Inventions, and (c) in favor of Persson on Smart Inventions's contingent cross-complaint.

Nokes filed multiple motions for judgment notwithstanding the verdict, based on the release, lack of fiduciary duty, lack of materiality, lack of a duty of disclosure, and lack of causation. All the motions were denied. As to the release in the stock redemption agreement, the trial court concluded that it had the equitable power to set aside the release provisions of the stock redemption agreement, in light of the jury's findings of fraudulent concealment.

Persson filed a motion for judgment notwithstanding the verdict for Smart Inventions on his fraudulent concealment claim. The trial court granted the motion, concluding that the evidence fully supported the conclusion that Nokes was acting on behalf of Smart Inventions at all times, and there was no substantial evidence to the contrary. Thereafter, the court awarded Persson attorney fees and costs in the amount of $365,710 (fees) and $48,183.95 (costs), and denied motions by Nokes and Smart Inventions for an award of fees and costs incurred subsequent to Persson's rejection of their offer to compromise under Code of Civil Procedure section 998. On November 17, 2003, an amended judgment was entered, including judgment in favor of Persson against Smart Inventions on the fraudulent concealment claim in the amount of $218,000 and the award of attorney fees and costs to Persson.

Three appeals were filed and briefed. Nokes appealed from the judgment against him and from the orders denying his motions for judgment notwithstanding the verdict. Nokes and Smart Inventions appealed from the March

---

[1] The court denied Nokes's motion for a directed verdict on the fiduciary duty claim.

10, 2003 order awarding attorney fees and costs, and Smart Inventions appealed from the amended judgment filed November 17, 2003. The three appeals were consolidated for hearing and determination.

## DISCUSSION

We address first the issues raised by Nokes's appeal, then turn to the appeal by Smart Inventions, and conclude with the dispute over attorney fees.

### A. *The Nokes appeal.*

Nokes raises five issues on his appeal from the judgment. He argues that:

—The mutual release provisions in the August 6, 1999 stock redemption agreement barred all of Persson's claims;

—The trial court erred in finding that Nokes owed Persson a fiduciary duty based on a de facto partnership or on a voluntary assumption of a fiduciary duty.

—The jury's verdict on the fraudulent concealment claim cannot stand because

1. the undisclosed information about the Tap Light was not legally material;

2. there was no duty to disclose that would support a concealment claim; and

3. the damages claimed by Persson were not proximately caused by the alleged concealment.

We treat each issue in turn.[2]

### 1. *The release in the stock redemption agreement does not bar Persson's claims.*

The August 6, 1999 stock redemption agreement contained mutual releases by Nokes, Smart Inventions and Persson, under which Persson released Nokes and Smart Inventions from all liability of any kind, known or unknown, "relating to this Agreement and [Persson]'s relationships in any capacity with [Smart Inventions] and Nokes." Nokes contends that the release

---

[2] The same issues, except for the fiduciary duty issue, are also raised by Smart Inventions in its appeal, which incorporates by reference the arguments and authorities relied on by Nokes. For convenience, we refer only to Nokes.

provision of the contract bars Persson from suing him for fraudulently inducing Persson to enter into the contract. According to Nokes, Persson's only option, if he wished to sue Nokes for fraud, was to rescind the entire stock redemption agreement and return the $1.6 million and other benefits he received under it. Like the trial court, we reject this proposition.

■ It is settled law that if a defrauded party is induced by false representations to execute a contract, the party has the option of rescinding the contract or affirming it and recovering damages for the fraud. (*De Campos v. State Comp. Ins. Fund* (1954) 122 Cal.App.2d 519, 525 [265 P.2d 617].) Persson chose to affirm the contract and recover damages for the fraud. Under Nokes's theory, Persson does not have that option because, in the very contract Nokes fraudulently induced Persson to execute, Persson released him from liability for his fraud. The theory cannot withstand analysis.

■ Nokes relies on two general rules of law to conclude that the trial court had no equitable power to set aside or refuse to enforce a release provision in a contract found to have been procured by fraud. These general rules are that:

(1) In order to escape from the obligations of a contract induced by fraud, the aggrieved party must rescind the contract (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415 [58 Cal.Rptr.2d 875, 926 P.2d 1061]); and

■ (2) A party may not ordinarily rescind only part of a contract. Rather, "one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions." (*Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 275 [209 P.2d 581] (*Simmons*).) Nokes theorizes that Persson cannot escape from his promise to release Nokes from unknown claims without rescinding the contract. Moreover, the trial court had no equitable power to void the release provisions because that "amounted to nothing more than a grant of *partial rescission*" contrary to California law.

California law, however, is not so shortsighted. The general rules relied upon do not apply to all circumstances, as will appear. More importantly, there is no support for, and we reject out of hand, the notion that a court has no equitable power to set aside a provision of a contract procured by fraud. Courts have long had the authority to set aside unconscionable or illegal contractual provisions, for example, while enforcing the remainder of a contract. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114, 123–126 [99 Cal.Rptr.2d 745, 6 P.3d 669] [Civ. Code, § 1670.5 codified the principle that a court can refuse to enforce

an unconscionable provision in a contract].) We fail to discern any reason why the court would not have the same authority when a contract has been procured by fraud. Moreover, the power to set aside a contractual provision cannot be equated with a "partial rescission" of a contract by one of its parties. Indeed, the theory underlying the general rule against partial rescission demonstrates that it should not and does not apply to limit a court's equitable power. Partial rescission by a party to a contract is not permitted because "retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate." (*Simmons, supra,* 34 Cal.2d at p. 275.) Setting aside the release provisions of the stock redemption agreement does not result in unjust enrichment, and does not bind the parties to a contract they did not contemplate.[3] Quite the opposite is true. The ruling merely sets aside mutual releases which were not in any event among the essential objects of the contract, which has a severability provision.

 ■ In short, a party who was fraudulently induced to contract to sell shares cannot be deprived of the well-recognized option to affirm the contract and sue for damages for fraud simply because the contract contained a mutual release of unknown claims. Not only would that result be a "Catch-22" of major proportions, the cases do not support it. We note the following examples.

In *Garcia v. California Truck Co.* (1920) 183 Cal. 767 [192 P. 708], cited by Nokes, the Supreme Court held that a contract of release was a bar to recovery in an action for damages for personal injuries, even if the release was obtained through fraudulent misrepresentation, since the plaintiff did not rescind the release or offer to restore the consideration the defendant paid for the release. In *Garcia,* however, the release of the personal injury claims was

---

[3] The cases cited by Nokes to show the impermissibility of partial rescission under California law demonstrate the proper application of that doctrine. For example, in *IMO Development Corp. v. Dow Corning Corp.* (1982) 135 Cal.App.3d 451 [185 Cal.Rptr. 341] (*IMO*), the parties entered into an agreement for the sale of property, which included a loan for the development of the property and the waiver of claims arising from a previous agreement concerning the financing of the property. The buyer sought to invalidate, on grounds of economic duress, the provision under which it waived its claims under the earlier agreement, while retaining title to the property and the proceeds of the loan. The court viewed this as an improper partial rescission, and rejected the contention that the rule against partial rescission did not apply because the waiver provision was severable. Since the buyer's complaint alleged that the seller informed the buyer it would transfer title and make the loan only if the buyer would waive its claims under the earlier agreement, and the agreement itself provided "for the sale of the property and advance of the loan in exchange for waiver of the claims and payment of the purchase price" (*IMO, supra,* 135 Cal.App.3d at p. 459), the contract was not divisible and therefore was not subject to partial rescission. In *IMO,* permitting rescission or invalidation of the waiver provision obviously would have "[bound] the parties to a contract which they did not contemplate." (*Simmons, supra,* 34 Cal.2d at p. 275.) That is simply not the case here, as the mutual release provision was not one of the essential objects of the contract.

the sole object of the contract, for which the consideration was paid. The money paid in exchange for the release was plaintiff's "only in the event that there had been a valid release of the claim for damages that he was then endeavoring to assert, and which would constitute a complete bar to his action." (*Id.* at pp. 772–773.) Consequently, plaintiff was required to return the money if he wished to assert the very claim he was paid to release. This, however, is not a case in which the release is the object of the contract. Indeed, as *Garcia* pointed out, a well-recognized rule—not applicable in *Garcia*—provides that " 'one who attempts to rescind a transaction on the ground of fraud is not required to restore that which in any event he would be entitled to retain either by virtue of the contract sought to be set aside, or of the original liability.' " (*Id.* at p. 771, quoting *Kley v. Healy* (1891) 127 N.Y. 555, 561 [28 N.E. 593], italics omitted.) In this case, there was no dispute about Persson's entitlement to the consideration he received under the stock redemption agreement in return for tendering his shares. The only question at issue was whether he was entitled to receive more.

The point is clarified further in *Sime v. Malouf* (1949) 95 Cal.App.2d 82 [212 P.2d 946]. In that case, plaintiff executed a general release of all claims as part of a sale transaction in which defendants acquired his interest in a joint venture project. Plaintiff later sued for damages for fraud, but made no offer to restore the consideration he had received in the sale. The Supreme Court found the release should not be construed to embrace unknown claims, but also held that even if it were so construed, "no restoration of the consideration received by [plaintiff], or any part of it, was required" (*id.* at p. 112), since the plaintiff had the right, independently of the release itself, to retain the sums he received. (*Id.* at p. 111.) The Court observed: "The law does not require, as the price of attack upon a fraudulently induced release, sacrifice of independent rights, or the doing of idle acts. . . . If plaintiff established his [fraud] claim, the $15,600 already received [in the sale transaction] would be deducted from the total amount found to be due . . . ; if, however, he failed to prove the alleged fraud, he would be entitled to retain the $15,600 as the contract consideration for the transfer to defendants of his interest since they stood upon the purchase and retained the property." (*Ibid.*) That is precisely this case. The Court expressly pointed out that—as in this case—the plaintiff "did not attempt to [rescind the sale], nor was he required to, in order that he might be free to sue for damages. Rescission and restoration are required only under equitable principles and to prevent the taking of unfair advantage. Restoration is not required unless the ends of justice require it." (*Id.* at p. 112.)[4]

---

[4] The parties argue at length over whether the nondisclosure of the Tap Light constituted fraud in the inception (which renders a contract void) or fraud in the inducement (which renders it voidable through rescission if the defrauded party chooses). The point is irrelevant to

In this case, it is patent that the "ends of justice" did not require Persson to rescind the stock redemption agreement and return the consideration he received in order to pursue his fraud claim. The trial court had the equitable power to set aside a release in a contract it found was induced by fraud, and was not constrained by the rule against partial rescissions, which itself is founded on equitable principles.[5]

### 2. *Nokes did not owe Persson a fiduciary duty based on a de facto partnership or on a voluntary assumption of a fiduciary duty.*

The trial court found Nokes owed and breached a fiduciary duty to Persson on two theories. It concluded that, despite the incorporation of the business in 1994, Nokes and Persson continued to operate as a partnership and, in addition, Nokes voluntarily assumed a fiduciary duty to Persson in connection with the purchase of Persson's shares. We conclude as a matter of law that neither ground supports a fiduciary duty under the circumstances of this case.

### a. *The rights and obligations of partnership cannot exist contemporaneously with the rights and obligations of shareholders in a corporation.*

Nokes and Persson were partners in a formal partnership until 1994, when they terminated the formal partnership and began to operate as a corporation. No evidence was presented of any failure since that time to observe corporate formalities. The corporation issued shares, appointed directors and officers, hired a corporate attorney, filed corporate tax returns, held directors' meetings, and so on. Nonetheless, the trial court, "mindful of the fact that it is apparently breaking new ground in this regard," found "the indicia of partnership which [Persson] has cited . . . is supported by the evidence here." The "indicia of partnership" consisted of testimony from Persson, Nokes and third parties that Nokes and Persson "earned the same salary, took equal distributions, were the only two directors of the company, and routinely referred to each other as partners all the way up to August 6, 1999." In addition, the minutes of a meeting of Smart Inventions's board of directors on May 7, 1998, prepared by the corporation's attorney and signed by Nokes

---

our decision, since Persson did not, and was not required to, rescind the contract in order to recover damages for fraud.

[5] Cf. *Sime v. Malouf, supra,* 95 Cal.App.2d at page 110 ("[i]f it was [defendants'] intention to obtain a release from the consequences of the very frauds they were committing, of which [plaintiff] was ignorant, and if they incorporated in it language designed to accomplish that purpose, this in itself, would have constituted a fraud upon plaintiff, rendering the release void and rescission unnecessary").

as the corporation's secretary, reported that Persson and Nokes had "acknowledged that it was probably time to end the 'partnership,' " a term used in the minutes in quotation marks.

The trial court's conclusion that this evidence established a "de facto" partnership that somehow existed concurrently with the corporate enterprise cannot be accepted. Preliminarily, the term "de facto partnership" is not one found in any California case. A partnership is defined by statute, as it was at common law, as an association of two or more persons to carry on as co-owners a business for profit (Corp. Code, § 16202, subd. (a)), and it is well settled that the existence of a partnership is a question of fact. (See *Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445 [88 Cal.Rptr.2d 130] [existence of partnership required a fact-intensive analysis].) In that sense, any partnership without a written agreement is a "de facto" partnership. However, under the Uniform Partnership Act, "[a]n association formed under a statute other than this chapter, a predecessor statute, or a comparable statute of another jurisdiction is not a partnership under this chapter." (Corp. Code, § 16202, subd. (b).) Consequently, considerable doubt exists that the obligations that flow from a partnership—including fiduciary duties among partners—may be imposed on the shareholders of a corporation duly formed and operated under California statutes. This becomes more apparent in this case where the finding of a de facto partnership was made solely for the purpose of imposing a fiduciary duty on the de facto partners, and not with respect to any other rights or obligations of partners, or for the purpose of enforcing a preincorporation agreement between the partners.

We are persuaded that, in the usual case and in this case, a partnership does not continue to exist after the formation of a corporation. (See, e.g., 8 Fletcher Cyclopedia of the Law of Private Corporations (2001 rev. vol.), § 4018, pp. 374–375, fns. omitted ["[u]pon the incorporation of a partnership and its merger in the corporate entity, the partners cease to be such, and have only the rights, duties and obligations of shareholders. There no longer exist any rights or obligations which the partners as such can enforce, the one against the other"]; see also *Miles, Inc. v. Scripps Clinic & Research Found.* (S.D.Cal. 1993) 810 F.Supp. 1091, 1099 [same; "the fact that the entity created . . . was a corporation, not a joint venture, precludes liability for breach of fiduciary duty"; "[b]y selecting the corporate form as a manner of achieving their goals, Miles and Scripps, both sophisticated parties, elected the benefits granted under that form and rejected the option and the benefits of continuing with a joint venture"].)[6]

---

[6] See also *Cross v. Globe-Boss-World Furniture Co.* (9th Cir. 1933) 63 F.2d 421, 425: "[W]hat was the relationship between Cross and Oswald? Were they officers, directors, and stockholders in the corporation, co-operating as such, or were they partners? The actions of individuals consistent with and predicated upon their relation in a corporation cannot be

A California court reached a similar conclusion more than 80 years ago. In *Cavasso v. Downey* (1920) 45 Cal.App. 780 [188 P. 594] (*Cavasso*), the court of appeal reversed a trial court finding that a partnership between plaintiff and defendant continued after the formation of a corporation, even though, as here, the parties began their business as a partnership, then formed a corporation which issued stock to them in equal shares, and thereafter "business was conducted in the same manner as before, the plaintiff and the defendant still considering themselves partners in the business." (*Id.* at p. 785.) In *Cavasso*, as here, the corporate formalities were duly observed. On this evidence, the court of appeal rejected the respondent's contention "that, 'as between themselves,' appellant and he were partners . . . ." (*Id.* at p. 786; see also *Kloke v. Pongratz* (1940) 38 Cal.App.2d 395, 402 [101 P.2d 522] ["[o]ne who alleges a partnership cannot prove it merely by evidence of an agreement wherein the parties call themselves partners. The use of the term 'partner' in the popular sense, or as a matter of business convenience will not necessarily import or imply an intention that a legal partnership should result"].)

The authorities recognize limited exceptions to the principle that partnership obligations cease to exist after the formation of a corporation. Partners may, by agreement, continue their relations as copartners in conjunction with their relationship as stockholders of a corporation, and "the law would take cognizance of such dual relationship and deal with 'the parties in the light of their agreement[s between themselves], independently of their incorporation' . . . ." (*Downey v. Cavasso* (1918) 36 Cal.App. 316, 318 [171 P. 1077], quoting *Shorb v. Beaudry* (1880) 56 Cal. 446, 450.) In *Shorb v. Beaudry*, for example, several parties associated themselves together for the purpose of uniting in one owner certain lands and water rights for the purpose of development and sale, "according to the terms of their agreements in writing." (*Shorb v. Beaudry, supra*, 56 Cal. at p. 449.) They agreed to incorporate and to convey land and water rights they owned, or agreed to procure, to the corporation; one party performed according to the agreement and others did not. (*Id.* at p. 450.) The Supreme Court concluded the corporation was formed "as a mere agency for more conveniently carrying out the agreements between" the three partners, and "[s]ubstantial justice can be administered . . . by treating the parties in the light of their agreements between themselves, independently of their incorporation, and in no other way that we have been able to discover can this be done." (*Ibid.*) The court therefore treated the capital stock of the corporation as partnership assets, to be sold and distributed in proportion to the interests of the partners as they had agreed. (*Id.* at p. 451; accord, *Hunt v. Davis* (1901) 135 Cal. 31, 34 [66 P. 957]; see also *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354, 368–369 [136 P.2d 651] ["[i]f a corporation . . . is a mere

---

twisted from their setting and measured in the same manner that they would be if there were no corporation."

agency for the purpose of convenience in carrying out a joint venture agreement, . . . justice would seem to demand that in determining the rights of the parties they be placed in the position each occupied under the original agreement"]; *Cavasso, supra,* 45 Cal.App. at p. 786 ["[i]n the absence of such an agreement, we find nothing in the actions, or relations of the parties, bringing the case within the rule . . . that the copartnership should be regarded as continuing"].)[7]

■ In short, the courts will enforce preincorporation agreements among partners or joint venturers who have incorporated in order to carry out the agreement between or among the partners or joint venturers. This, however, is not such a case. Smart Inventions, Inc., was not formed to carry out a preincorporation agreement which was later breached. Additionally, this is not a case where substantial justice requires that the parties be treated in accordance with a preincorporation agreement.

■ Accordingly, we apply the ordinary principle that, after a partnership is incorporated, the rights or obligations which partners can enforce against each other no longer exist. In the absence of a preincorporation agreement or evidence the corporate form was disregarded, shareholders in a duly formed corporation operating in accordance with legal requirements do not become de facto partners, and thereby acquire fiduciary duties to each other, simply because they earn the same salary and refer to each other for convenience as partners. They have the rights and obligations of shareholders, not partners, and the trial court erred in concluding otherwise.

b. *The voluntary assumption of a fiduciary obligation cannot occur between parties to an arms-length negotiation for the sale of shares in a corporation.*

The trial court adopted the jury's advisory finding that Persson reposed his trust and confidence in Nokes, and that Nokes voluntarily accepted that trust and undertook to act on behalf of Persson as a fiduciary in connection with

---

[7] In *Elsbach v. Mulligan,* the court concluded an action will lie "by an adventurer against his coadventurer for a wrong inflicted by the latter in the carrying out of their joint undertaking, notwithstanding that for the purposes of convenience the enterprise has been clothed with a corporate form. In this case the resort to the corporate mechanism cannot efface the true purpose of the original joint adventure. The corporate entity and appellant's machinations . . . both before and after its creation were used with the fixed purpose of obtaining the interest and property of" the respondent. (*Elsbach v. Mulligan, supra,* 58 Cal.App.2d at p. 370; see also *MacMorris Sales Corp. v. Kozak* (1968) 263 Cal.App.2d 430, 438–439 [69 Cal.Rptr. 719] [in cases where a corporation is a medium for a preincorporation joint venture or partnership, a joint adventurer or partner may be treated as an equitable owner of assets contributed to the corporation; "[t]he use of the corporation as a medium for the venture, survives the corporation"].)

the purchase of Persson's shares. The court believed this was the "strongest" basis for the existence of a fiduciary duty "based on the evidence in the case." It pointed out that the accountants and lawyers representing the parties "involved themselves with the legal and financial aspects of this deal," and that "it was the letters from Mr. Nokes and the meetings between Mr. Nokes and [Persson] which was the primary forum for a disclosure and discussion about the nature and existence with [*sic*] the products then available—or in the pipeline. And the court is of the view that that evidence supports the conclusion that Mr. Nokes did indeed undertake to assume the role of the one producing this information and seeking to have [Persson] [repose] his trust and confidence in [him]."

 The evidence supports the view that Nokes undertook to produce information about the products the company had available or "in the pipeline," and that he failed to disclose the Tap Light. From this, liability for fraudulent concealment may properly be found, because a person who undertakes to furnish information in a transaction may not then suppress or conceal material facts. (*Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 201 [227 Cal.Rptr. 887].) The imposition of a fiduciary duty in the same circumstances, however, is a different matter entirely. An examination of the cases involving the voluntary assumption of a fiduciary duty convinces us that, in the circumstances of this case, no fiduciary duty existed as a matter of law.

 We review first the basic principles of fiduciary and confidential relations. The two terms are often said to be synonymous, but there are "significant differences." (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271 [130 Cal.Rptr.2d 601] (*Richelle L.*).) Both relationships give rise to a fiduciary duty, that is, a duty "to act with the utmost good faith for the benefit of the other party." (*Bacon v. Soule* (1912) 19 Cal.App. 428, 434 [126 P. 384].) " 'Technically, a fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client . . . whereas a "confidential relationship" may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship.' " (*Richelle L., supra,* 106 Cal.App.4th at p. 271, quoting *Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 382 [193 Cal.Rptr. 422].) A confidential relation may exist where there is no fiduciary relation. (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337–338 [15 Cal.Rptr. 71, 364 P.2d 247].)[8] "Because confidential relations do not fall into

---

[8] "The prerequisite of a confidential relationship is the reposing of trust and confidence by one person in another who is cognizant of this fact. The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another. It is evident that while these two relationships may exist simultaneously, they do not necessarily do so." (*Vai v. Bank of America, supra,* 56 Cal.2d at p. 338.)

well-defined categories of law and depend heavily on the circumstances, they are more difficult to identify than fiduciary relations." (*Richelle L., supra*, 106 Cal.App.4th at p. 272.) The existence of a confidential relationship is a question of fact, and " 'the question is only whether the plaintiff actually reposed such trust and confidence in the other, and whether the other "accepted the relationship." ' " (*Richelle L., supra*, at p. 272, fn. 6, quoting Chodos, The Law of Fiduciary Duties (2000) pp. 49–50.) A "relationship" must exist over a period of time. (*Richelle L., supra,* at p. 272, fn. 6, citing Chodos, The Law of Fiduciary Duties, *supra*, at p. 53.)

 We are mindful from the quoted authorities that the existence of a confidential relationship generating a fiduciary duty is a question of fact. Nonetheless, because of "[t]he vagueness of the common law definition of the confidential relation that gives rise to a fiduciary duty, and the range of the relationships that can potentially be characterized as fiduciary," the "essential elements" have been distilled as follows: " '1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself.' " (*Richelle L., supra*, 106 Cal.App.4th at p. 272, quoting *Langford v. Roman Catholic Diocese of Brooklyn* (1998) 177 Misc.2d 897, 900 [677 N.Y.S.2d 436], fns. omitted.) In short, vulnerability "is the necessary predicate of a confidential relation," and "the law treats [it] as 'absolutely essential' . . . ." (*Richelle L., supra*, 106 Cal.App.4th at p. 273, quoting Bogert, Trusts & Trustees (2d ed. 1978) § 482, at pp. 288–289.)[9]

We conclude that the "necessary predicate" of vulnerability on Persson's part is completely absent from the evidence in this case. Indeed, there is no evidence of a "weaker" or a "stronger" party. The evidence, at most, is that Nokes undertook to tell Persson everything about the current state of the business, and Persson trusted him to do so. If that were sufficient to create a fiduciary obligation "to act with the utmost good faith for the benefit of the other party" (*Bacon v. Soule, supra*, 19 Cal.App. at p. 434), virtually every purchase and sale transaction would give rise to fiduciary duties. That clearly is not the case. (See *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 31

---

[9] The court in *Richelle L.* also cites an opinion authored by United States Supreme Court Justice William J. Brennan, Jr., when he served on the Appellate Division of the Superior Court of New Jersey. Justice Brennan stated that the essentials of a confidential relation are " ' "a reposed confidence and the dominant and controlling position of the beneficiary of the transaction." [Citation.] . . . It exists when the circumstances make it certain that the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed.' " (*Richelle L., supra*, 106 Cal.App.4th at p. 271, fn. 4, quoting *In re Stroming's Will* (1951) 12 N.J.Super. 217, 224 [79 A.2d 492].)

[130 Cal.Rptr.2d 860] [rejecting contention by contracting party that a fiduciary duty existed because he necessarily reposed trust and confidence in the other party to account for and pay the contingent compensation agreed upon in the contract and in the control of the other party; "[e]very contract requires one party to repose an element of trust and confidence in the other to perform"].)

In sum, we reject the notion that a confidential relationship may arise, in the course of arms-length buyout negotiations between two equal shareholders of a corporate enterprise, both of whom are represented by counsel and accountants, simply because one undertakes to "paint you the truest picture possible of where the company is right now," and the other relies on him to do so. Indeed, this is the antithesis of situations in which confidential relations give rise to fiduciary obligations. "The vulnerability that is the necessary predicate of a confidential relation . . . usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity." (*Richelle L., supra,* 106 Cal.App.4th at p. 273.) In the absence of evidence of any similar vulnerability or incapacity, we decline to extend the scope of fiduciary obligations to an arms-length negotiation for the sale of shares in a corporate enterprise. The trial court erred in doing so, and the judgment awarding damages for breach of fiduciary duty must be reversed.

3. *An award of damages for fraudulent concealment is supported by the evidence, and the denial of motions for nonsuit and for judgment notwithstanding the verdict was not erroneous.*

Nokes challenges the jury's verdict awarding damages for fraudulent concealment on three grounds: the undisclosed information was not legally material; Nokes was under no duty to disclose the information; and the damages awarded were not caused by the concealment. None of these grounds is meritorious.

a. *Substantial evidence supports the finding that the undisclosed information about the Tap Light was material.*

Nokes contends that the jury's conclusion that the Tap Light was material was unsupported because, when the stock redemption agreement was executed, "there was no way to predict . . . whether any profits would be made from the 'Tap Light,' or if so, the amount . . . ." The absence of any reliable basis for projecting profits from a potential new product, Nokes argues, means that the product is not material, as a matter of law, to a shareholder's decision to sell shares in a corporation. We do not agree.

Under California law, a fact is material if " 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' . . . ." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [64 Cal.Rptr.2d 843, 938 P.2d 903] (*Engalla*), quoting Rest.2d Torts, § 538, subd. (2)(a).) In this context, a fact is material, and the jury was so instructed, "if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision." Materiality is a question of fact for the jury, "unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.' "[10] (*Engalla, supra,* 15 Cal.4th at p. 977, quoting Rest.2d Torts, § 538, com. e, p. 82.)

Ample evidence permitted the jury to find that a reasonable investor would have considered the existence of the Tap Light important in deciding whether and at what price to sell his shares in the corporation. The evidence showed, for example, that the Tap Light was one of a relatively small number of products for which television commercial spots were produced and aired during the corporation's history. The Tap Light was under development by Nokes as a potential new product as early as April 1999, and a commercial spot was readied to launch in a national media campaign in July 1999. Persson testified that no one in his position would have signed away his interest in the corporation on the same day a commercial for a new product was scheduled to air, because results from spot commercials in test markets are available within just a few days, and when the results are good, "that paper you can basically take to the bank." Persson's attorney in the transaction testified that "products in the pipeline" are an important element in the valuation of a corporation. Valerie Castle, a consultant in the direct response television marketing business, testified that in her opinion the Tap Light was "substantially material" to the value of Smart Inventions, and that it would not have been reasonable to sign away a half interest in Smart Inventions without waiting the short time necessary to see whether or not the Tap Light commercial was a success.[11]

Nokes insists several federal cases support the proposition that the inability to predict the profitability of a potential new product means, as a matter of law, the product is not material to a shareholder's decision to sell his shares.

---

[10] See *TSC Industries, Inc. v. Northway, Inc.* (1976) 426 U.S. 438, 450 [48 L.Ed.2d 757, 96 S.Ct. 2126] (determination of materiality requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

[11] When Nokes was asked if he "would have wanted to wait the weekend, a mere 72 hours, to see if the commercial was successful," he responded, "I don't think so (shrug of shoulder). I can't even answer that (shake of the head)."

The cases do not support that proposition. None of them pertain to the materiality of information on a new product to a shareholder's decision to sell shares.[12] The cases merely support the general and undisputed points that hindsight may not be used to determine whether a fact is material, and that forecasts of a corporation's future prospects—as opposed to the facts from which such forecasts may be derived—are not material.[13] The cases do not assist Nokes, where the relevant question is whether a reasonable investor would want to know about the existence of a product in the corporate pipeline—a product in which the Home Shopping Network had expressed interest and for which there were imminent plans to advertise in test markets—before deciding to sell his shares in the company. Unless it can be said the information about the Tap Light was " 'so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it' " (*Engalla, supra*, 15 Cal.4th at p. 977, quoting Rest.2d Torts, § 538, com. e, p. 82), the finding of materiality must be upheld. The trial court did not err in doing so.

> b. *Nokes had a duty to disclose the information about the Tap Light.*

Nokes contends that an essential element of a claim for fraudulent concealment is a duty of disclosure, and that no duty to disclose existed. His rationale is that he has been unable to find any California cases imposing a duty of disclosure on a buyer of securities, absent a fiduciary relationship. Because Persson had statutory rights of access to corporate information, Nokes had no duty to make certain that Persson had all material information.

 Nokes's analysis is erroneous, as it overlooks the critical principle that intentional concealment exists when a party to a transaction, who is

---

[12] See *In Re Worlds of Wonder Securities Litigation* (9th Cir. 1994) 35 F.3d 1407, 1417 (prospectus for a public offering of junk bonds was not misleading in failing to disclose price protection practices which did not pose a foreseeable risk to investors at the time of the offering; speculative impact of future exchanges and price reductions was not material; potential action to be taken sometime in the distant future is not an item appropriately made a part of a public disclosure because of its speculativeness); *In Re VeriFone Securities Litigation* (9th Cir. 1993) 11 F.3d 865, 869 (failure to disclose, in prospectus and registration statement, certain forecasts that future prospects might not be as bright as past performance was not a material omission if there was no withholding of financial data or other existing facts from which forecasts are typically derived); *Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb* (9th Cir. 1985) 769 F.2d 561, 566–567 (information about inventory levels and a proposal to sell two subsidiaries was not material at the time plaintiffs purchased their stock, because no jury could properly find the information would have put a reasonable investor on notice that the company was in serious financial condition).

[13] The jury was properly instructed that evidence of profits earned by the Tap Light after the sale of Persson's shares was irrelevant to an evaluation of whether information was material at the time of sale, and that materiality was to be determined at the time of the transaction, not in hindsight.

under no duty to speak, nevertheless does speak and suppresses facts which materially qualify the facts stated. (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 [60 Cal.Rptr.2d 539] [nondisclosure or concealment may constitute actionable fraud when the defendant makes partial representations but also suppresses some material facts].) The evidence supported the conclusion that Nokes specifically undertook to produce all relevant information about the financial state of the corporation. He wrote to Persson that he would "paint you the truest picture possible of where the company is right now," and prepared extensive handwritten analyses of the corporation and its circumstances. From these analyses, he omitted the Tap Light. Under these circumstances, the jury was entirely justified in finding an intentional concealment of material facts.

> c. *The damages awarded to Persson were caused by Nokes's fraudulent concealment of the Tap Light.*

Nokes contends that the damages Persson claimed were "not caused by the concealment of the 'Tap Light,' but rather by a different method of assessing the historical earnings of the company." To understand and address Nokes's argument, we must first describe the measure of damages applicable to fraud in the sale of property, and the expert testimony presented at trial.

As Nokes correctly points out, fraud damages are computed under the out-of-pocket loss rule stated in Civil Code section 3343. Under the rule, Persson was entitled to recover the difference, if any, between the actual value of the interest with which he parted (his shares in the corporation) and the actual value he received ($1.4 million). After hearing extensive expert testimony on the value of Smart Inventions as of the date of the transaction, the jury found the difference was $218,000 and awarded Persson economic damages in that amount on his fraudulent concealment claim.

The jury's finding was supported by the evidence. Persson's expert, William Mowrey, testified that, at the time of the transaction, the value of Smart Inventions was $8,661,000, so that Persson's 50 percent holding was worth approximately $4.3 million, or approximately $2.9 million more than the $1.4 million he received. James Schilt, Nokes's expert, testified that the fair market value of the corporation at the time of the transaction was $3,136,500, so that Persson's shares were worth approximately $1.6 million. Schilt testified that Persson was paid "very close to the liquidating value" of his share of the company, but "less than what I estimated to be the fair market value."[14]

---

[14] Schilt used two different methods of valuation, the risk-scale method and the capitalization of earnings method, and averaged the two figures. Under the capitalization of earnings method, the fair market value of the company was $2,868,000. Using the risk-scale method,

Accordingly, the evidence supports the conclusion that Persson's shares, at the time of the sale, were worth more than the amount he received for them—anywhere from $168,250 more to $2.9 million more. Nokes argues, however, these damages were "not caused by the concealment of the 'Tap Light,' but rather by a different method of assessing the historical earnings of the company." His argument is that Mowrey's testimony on the value of the company at the time of the sale was based on historical earnings, and would not have been different even if the Tap Light had been disclosed or had never existed. From this point, which is correct, he concludes that the fraudulent concealment did not cause any damages. His conclusion lacks logic, and misperceives the necessary causal nexus between the fraud and the damages.

As Nokes points out, the relevant date for valuation of the corporation is the date of the transaction, and the valuation must be independent of any future profits earned from the Tap Light. The valuation of the corporation, however, is unrelated to the causal nexus between the concealment and the damages.[15] The jury was entitled to conclude that the concealment of the Tap Light caused the damages because, if Persson had possessed full information about the Tap Light, he would not have sold his shares in the corporation when and at the price at which he sold them.

Nokes is correct in pointing out that, if damages do not flow from the concealment, but rather from some other extrinsic factor, the award of damages would be improper. The cases cited by Nokes demonstrate the point.[16] In this case, however, Persson's damages were not caused by any

---

the value was approximately $3.4 million. Schilt averaged the results under the two methods, testifying that both were suitable methods of valuation under the circumstances.

[15] The illogic of Nokes's position is clear from his statement that "Persson was required to present evidence of the value the shares would have possessed *had the fraud not occurred* . . . ." The value of the shares, however, necessarily remains the same, whether or not a fraud occurs, and Persson presented evidence of that value.

[16] In *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498 [198 Cal.Rptr. 551, 674 P.2d 253], the Supreme Court reversed an item of "delay damages" for increased construction costs during the six-month period between a broker's misrepresentation—that the sellers had accepted the plaintiff's offer to buy their property—and the plaintiff's discovery that the sellers had actually refused the offer. As the plaintiff conceded on appeal, he suffered no damages from the delay because his inability to begin construction was caused by the sellers' refusal to sell, not by the broker's misrepresentation. (*Id.* at p. 504.) In the other case Nokes cites, *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807 [52 Cal.Rptr.2d 650], the court concluded a complaint for fraudulent inducement to enter into a contract did not state a claim because defendant's false promises were not a proximate cause of plaintiff's claimed losses. In that case, it was alleged the defendant company falsely promised to take steps to ensure continued performance of a janitorial services agreement with plaintiff, a nonunion company, during a union campaign. The parties performed under the agreement for several months and then the company terminated the agreement. The court found that, because the parties performed their contractual promises for several months, the expenses plaintiff incurred in preparing to perform its contractual duty, which plaintiff claimed as damages, were essential

similar extrinsic factor. In essence, Nokes claims the damages—the difference between the actual value of Persson's shares and the amount he received for them—were caused by Persson's failure to value the corporation correctly in the first place, not by the concealment. However, Persson was deprived of information he should have had in making his evaluation of the price at which to sell, and from this deprivation it is reasonable to conclude the concealment was a proximate cause of the damages. Accordingly, the trial court did not err in refusing to set aside the verdict on this ground.

> B. *The Smart Inventions appeal: Smart Inventions was liable for Nokes's fraudulent concealment under principles of respondeat superior.*

"[A] private corporation is generally liable under the doctrine of respondeat superior for torts of its agents or employees committed while they are acting within the scope of their employment . . . ." (*Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1488 [255 Cal.Rptr. 755]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 37, p. 96.) The jury was instructed regarding that principle.[17] Nonetheless, while the jury concluded Nokes concealed or suppressed material facts, it found that Smart Inventions did not. Thereafter, the trial court granted Persson's motion for judgment notwithstanding the verdict on Persson's fraudulent concealment claim, concluding that the evidence fully supported the conclusion that Nokes was acting on behalf of Smart Inventions at all times, and there was no substantial evidence to the contrary.[18]

Smart Inventions challenges the trial court's conclusion. It contends the jury had ample evidence from which to conclude that the fraud occurred while the parties were negotiating a transaction between individual shareholders, and that the parties "chang[ed] the deal structure at the very end," substituting Smart Inventions as the purchaser of Persson's shares, to achieve

---

to its subsequent performance of the agreement, and therefore could not be considered a detriment caused by the defendant's false promises. That is, it was the termination of the agreement, not the defendant's false promises inducing the agreement, that resulted in the alleged harm. (*Id.* at pp. 1818–1819.)

[17] The jury was instructed: "Smart Inventions, Inc. is a corporation. A corporation can act only through its officers and employees. Any act or omission of an officer or employee within the scope of authority or employment is, in law, the act or omission of such corporation."

[18] The trial court stated, in part: "While the initial meetings between Nokes and Persson may have contemplated a shareholder to shareholder sale only, in the court's view the corporation is not insulated from the benefits of the sale, to the extent they were derived in whole or in part from the concealment by Nokes. . . . The timing of the statements is not dispositive here given the actual transaction that was consummated and the direct benefit to the corporation derived therefrom. One cannot negotiate claiming to be in an individual capacity, change the structure of the deal to a corporate purchase or buy back, and then insulate the corporation from the statements or omissions of its President which influenced the sale."

specific tax benefits for Persson and Nokes. The jury could reasonably have found, Smart Inventions argues, that any wrongful act by Nokes in not disclosing information to Persson occurred while Nokes was negotiating for his own benefit, and before Smart Inventions became involved in the transaction in any way. Since the "wrongful act" occurred during those early negotiations, Nokes was acting in an individual capacity at the time of the wrongful act. While the argument is superficially appealing, it cannot survive closer analysis.

The tort in this case was fraudulent concealment, which is not actionable absent all the elements of fraud. A misrepresentation or concealment does not amount to fraud unless and until there is reliance on it. Consequently, the fraud was not complete until Persson, Smart Inventions and Nokes executed the stock redemption agreement. Had no sale occurred, there would have been no fraud. The point becomes clear in a case such as this, where the fraud is a concealment rather than an affirmative misrepresentation. Nokes's "wrongful act"—the concealment of the Tap Light—was necessarily a continuing "wrongful act." The concealment did not occur only during the meetings between Nokes and Persson. It necessarily existed throughout the negotiations, up to and including the execution of the agreement in which Smart Inventions purchased Persson's shares.

In short, Nokes possessed the information about the Tap Light and could have disclosed it at any time before the execution of the stock redemption agreement. Even if the jury believed Nokes acted only in his individual capacity during the June 1999 negotiations between him and Persson, he was clearly acting for Smart Inventions by the time the agreement was executed, as his signature on behalf of Smart Inventions demonstrates. Accordingly, his continued concealment of the Tap Light was an "act or omission" of an officer of Smart Inventions within the scope of his employment and, as a matter of law, the act or omission of Smart Inventions. The trial court properly granted Persson's motion for judgment notwithstanding the verdict.

### C. *The Nokes and Smart Inventions appeal of the order awarding attorney fees and costs.*

Nokes and Smart Inventions appeal from the trial court's order awarding Persson attorney fees and costs, and denying their motions under Code of Civil Procedure section 998, subdivision (c)(1) for an award of fees and costs. They argue that the trial court erred in:

—Invalidating their section 998 offer, which was for $500,000;

—Awarding $344,101 to Persson for services from James R. Rosen, because the amount exceeded the amount of fees Persson actually owed Rosen for services under the contingency fee agreement between Persson and Rosen;

—Denying as untimely Nokes's joinder in Smart Inventions's motion for post-section 998 offer fees and costs; and

—Double-counting certain cost items.

We address each claim in turn.

1. *Invalidating the section 998 offer by Nokes and Smart Inventions was erroneous.*

On September 24, 2001, almost 10 months before trial, Nokes and Smart Inventions made an offer of judgment under Code of Civil Procedure section 998. They offered "to allow judgment to be taken against them in this action, jointly and severally, in the total amount of $500,000.00, inclusive of any and all costs and attorneys' fees." After judgment was entered and posttrial motions were resolved, Smart Inventions filed a motion for an award of post-section 998 offer fees and costs, in which Nokes later joined. Smart Inventions sought an award of fees in the amount of $744,881, for fees incurred after the September 24, 2001 offer, because Persson failed to recover more than the $500,000 offered.

The trial court denied Smart Inventions's motion, ruling that the section 998 offer by Nokes and Smart Inventions was invalid. It explained that, when the offer was made, Persson's claims against Nokes and Smart Inventions were not identical. At the time of the offer, the court had already ruled that Smart Inventions owed no fiduciary duty to Persson, and consequently "there was no potential joint and several liability of the defendants." Because the section 998 offer "was a joint and several offer for multiple defendants and did not separate out and distinguish between them and the separate causes of action applicable to each," Persson "was not in a position to evaluate the offer . . . ." The court observed that cases permitting joint section 998 offers by multiple defendants are all premised on the defendants' joint and several liability.

We conclude the trial court erred in invalidating the joint offer by Nokes and Smart Inventions.[19] A joint offer by two defendants that judgment in a stated amount may be taken against each one of them, jointly and

---

[19] Contrary to Persson's contention, the issue of application of section 998 to an undisputed set of facts is an issue of law, which we review de novo. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 797 [101 Cal.Rptr.2d 167].)

severally, even though one defendant has no potential liability on one of plaintiff's claims, is not uncertain. The offer in no way prevents the plaintiff from assessing his chances of obtaining a better judgment against either defendant after trial. Moreover, such an offer does not present any difficulty in determining whether the subsequent judgment is more favorable than the offer. Consequently, no reason exists for its invalidation. We briefly describe the relevant principles, and then explain their application.

 Code of Civil Procedure section 998 is intended to encourage the settlement of lawsuits prior to trial, by penalizing a party who fails to accept a reasonable offer. As relevant to this case, section 998, subdivision (c)(1) provides that: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer." The party offering the settlement bears the burden of demonstrating that a section 998 offer is valid, and the offer must be strictly construed in favor of the party subjected to its operation. (*Barella v. Exchange Bank, supra,* 84 Cal.App.4th at p. 799.) An offer of settlement must be certain, and when an offer is made jointly, the offeree must be able to evaluate the likelihood of each offeror receiving a more favorable verdict at trial. (See *Hurlbut v. Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 410 [254 Cal.Rptr. 840] [plaintiffs' joint offer to defendant].)

In this case, Nokes and Smart Inventions made a joint offer, under which they would allow judgment to be taken against them, jointly and severally, in the total amount of $500,000. Persson contends the offer was invalid, because his claim for breach of fiduciary duty was asserted only against Nokes, while his fraud and other claims were asserted against both Nokes and Smart Inventions. Because defendants were not jointly and severally liable on all claims, Persson argues, the joint offer placed him in an "untenable position," as he had no opportunity to assess the chances of prevailing against each defendant in an amount in excess of the offer. We cannot agree with this analysis, which is both logically flawed and unsupported by the cases or the policy underlying Code of Civil Procedure section 998.

First, it is incomprehensible why a plaintiff would be unable to evaluate an offer in which each defendant offers to have judgment taken against him, jointly and severally, in a stated amount, even if one defendant has no liability on one of the plaintiff's claims. The plaintiff need only assess the chances of recovery on each of his claims, no matter which defendant is liable, and add them together. If the joint offer exceeds that amount, the plaintiff should accept it. In this case, Persson had only to assess his chances of recovering more than $500,000 on all of his claims against both defendants. Even though Smart Inventions would not be liable after trial for breach

of fiduciary duty, the offer encompasses all causes of action and all liability of both defendants. The evaluation is straightforward, as is the ability to determine after trial whether the offer was more favorable than the judgment. Persson argues he is placed in an untenable position because he must either take the unapportioned offer "or perhaps risk paying enormous post-offer attorneys' fees to only one of the Defendants." There is no such risk. The offer was joint, and Persson could not accept the offer as against one defendant and not the other. Even if, after trial, one defendant were found to have no liability, that defendant could not claim post-offer costs against Persson unless the other defendant's liability was also less than the offer, since the offer was a joint offer.

Second, the available precedents do not require the conclusion that the offer was invalid. Persson relies on *Burch v. Children's Hospital of Orange County Thrift Stores, Inc.* (2003) 109 Cal.App.4th 537, 545 [135 Cal.Rptr.2d 404] (*Burch*), and the cases cited in *Burch*, for the proposition that a section 998 offer made by multiple defendants is valid only if the defendants are jointly and severally liable. *Burch*, however, involved a plaintiff's unapportioned offer to multiple defendants, an offer which was invalid because the defendants had potentially varying liability at the time the offer was made. Because the plaintiff did not specify the amount she sought from each defendant, no determination could be made whether a subsequent judgment against one defendant was more favorable than the offer. (*Id.* at pp. 540, 547–550.) No such problem exists with an offer by multiple defendants to a single plaintiff, where the offer is for a joint and several judgment against both defendants.

Persson also cites several cases which affirmatively state that joint offers by more than one defendant are valid when the defendants are sued on a theory of joint and several liability. (E.g., *Brown v. Nolan* (1979) 98 Cal.App.3d 445, 451 [159 Cal.Rptr. 469] [where a single plaintiff sued two defendants on a theory of joint and several liability, defendants' joint offer to plaintiff was valid, since each defendant was potentially liable for the full amount of any judgment; court rejected plaintiff's argument that Code Civ. Proc. § 998 did not allow joint offers because its language is in the singular, holding that the joint offer was properly read as an offer by each defendant that judgment could be taken against each one of them, jointly and severally].) A case, however, is not authority for a proposition it did not consider. None of the cases cited by the parties has expressly addressed the question presented: whether a joint offer by two defendants, in which the defendants offer to have judgment taken against each of them, jointly and severally in a stated amount, is invalid solely because the two defendants are

not in fact jointly and severally liable on all claims.[20] No reason can be deduced for invalidating such an offer. The policies underlying the statute would not be advanced by doing so. The offer by Nokes and Smart Inventions contained no uncertainty, and did not require Persson to make any risk assessment that is not always required of a plaintiff who receives a section 998 offer. Persson could easily assess his chances of obtaining a judgment from either or both defendants totaling more than the offer, and it is likewise easy in retrospect to determine whether the judgment is more favorable than the offer.

Accordingly, we conclude the section 998 offer by Nokes and Smart Inventions was not rendered invalid by the fact that Nokes and Smart Inventions were not jointly and severally liable on all of Persson's claims. We express no opinion on questions not addressed by the trial court, including whether the offer was otherwise reasonable and whether Persson obtained a more favorable judgment. Those issues are to be determined on remand.

> 2. *An award of fees to Persson's attorney in an amount greater than Persson owed Rosen under their contingency fee agreement was not erroneous.*

After finding the section 998 offer by Nokes and Smart Inventions was invalid, the trial court awarded Persson attorney fees of $365,710. Of this amount, $344,101 was allocated for services provided by the Law Offices of James R. Rosen, and $21,609 to a firm which represented Persson until Rosen assumed responsibility for Persson's representation. While the amount awarded may be different after the necessary determinations on remand, Persson nonetheless will be entitled to reasonable fees and costs for the period preceding the section 998 offer. Accordingly, we address the contention by Smart Inventions and Nokes that the attorney fee award to Rosen

---

[20] The parties also cite *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102 [30 Cal.Rptr.2d 486] (*Santantonio*) and *Winston Square Homeowner's Assn. v. Centex West, Inc.* (1989), 213 Cal.App.3d 282 [261 Cal.Rptr. 605] (*Winston Square*). *Santantonio* held that a jointly made offer by two defendants in an age discrimination case was proper, even though one of the defendants was granted a directed verdict on the ground it had no joint or respondeat superior liability. The court reasoned that all the defendants were sued on the theory they were jointly and severally liable and filed a joint answer, so that the rationale in *Brown v. Nolan* applied. (*Santantonio, supra,* 25 Cal.App.4th at pp. 114–116 & fn. 4 ["[i]t would be a strained result to hold that defendants' joint 998 offer was rendered invalid simply because plaintiffs failed to sustain their claim that [one of defendants] was in fact an employer"].) *Winston Square* also recited the *Brown v. Nolan* holding that joint offers by more than one defendant are valid when defendants are united in interest and are sued on a theory of joint and several liability. (*Winston Square, supra,* 213 Cal.App.3d at p. 294.) In *Winston Square*, a construction defect case, the court went further and held valid a joint offer, even though the defendants were not united in interest. The court observed that "[n]evertheless, the application of section 998 appears appropriate in this case," apparently because the defendant seeking section 998 costs was "completely absolved of any liability." (*Ibid.*)

must be reversed. This is required, they argue, because attorney fees are limited to those Persson "actually incurred" under his contingency fee agreement with Rosen, the terms of which were not disclosed to the court.[21] The trial court concluded otherwise, finding that the contingency agreement between Persson and Rosen did not bar Persson's recovery of reasonable attorney fees under the Stock Redemption Agreement. We agree.

Code of Civil Procedure section 1021 provides that, except as specified by statute, "the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties . . . ." In the stock redemption agreement the parties agreed as follows: "In the event of any claim, dispute or controversy arising out of or relating to this Agreement, . . . the prevailing party in such action or proceeding shall be entitled to recover court costs and reasonable out-of-pocket expenses not limited to taxable costs . . . and reasonable attorneys' fees to be fixed by the court. Such recovery shall include court costs, out-of-pocket expenses and attorneys' fees on appeal, if any. The court shall determine who is the 'prevailing party,' whether or not the dispute or controversy proceeds to final judgment. If either party is reasonably required to incur such out-of-pocket expenses and attorneys' fees . . . then the prevailing party shall be entitled to recover such reasonable out-of-pocket expenses and attorneys' fees whether or not an action is filed." Smart Inventions does not dispute Persson's right as the prevailing party to recover attorney fees under this provision. It argues, however, that both section 1033.5 of the Code of Civil Procedure and the attorney fee clause in the stock redemption agreement limited the award of fees to those "actually incurred." Neither contention is correct.

First, Smart Inventions argues that Code of Civil Procedure section 1033.5 does not allow an award of attorney fees as costs that exceeds the amount of fees actually incurred. Section 1033.5 lists the items allowable as costs as a matter of right under section 1032. One item listed is attorney fees, when authorized by contract. (Code Civ. Proc., § 1033.5, subd. (a)(10)(A).) Subdivision (c) of section 1033.5 states that an award of costs is subject to several provisions, including that "[c]osts are allowable if incurred, whether or not paid." (*Id.*, subd. (c)(1).) From this last

---

[21] According to Rosen's declaration, Persson entered into a contingency agreement with his firm. "Any amount of money, regardless of the source, recovered in favor of Thomas Persson is then divided according to the terms of the retainer agreement between Mr. Persson and the law firm. The [firm] does not recover 100% of any awarded attorneys' fees. It is the policy of my law firm to 'pool' all money recovered in a client's action and then take the proportionate attorneys' fees and costs out of the total recovery." At the hearing on fees, Rosen reiterated this point, stating that if Persson had recovered one dollar and attorney fees of $1.1 million were awarded, he would be obligated to split with Persson $1,100,001 by the terms of his contingency, and that "the contingency fee agreement . . . is actually a contingency for the entire amount."

provision, Smart Inventions concludes that, "by negative implication," attorney fees may not be awarded as costs if Persson did not actually incur or become obligated to pay them.

We cannot read subdivision (c) as forbidding the award of attorney fees in all instances when they were not "actually incurred," or as addressing the point in any way. Numerous circumstances exist in which attorney fees are awarded even though not "actually incurred." A prime example is the Supreme Court's decision in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094–1095 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM*), holding that attorney fees may be recovered under Civil Code section 1717 for the work of in-house counsel. The Court expressly held the trial court was not required to use a "cost-plus approach," namely a calculation of the actual salary, costs and overhead of in-house counsel, and could instead use market value to determine reasonable attorney fees. (22 Cal.4th at pp. 1096–1097.) This conclusion was reached even though the statute authorizing fees as costs— Civil Code section 1717—specifically refers to fees which are "incurred." Other examples may also be cited under section 1717 and in other contexts. (See, e.g., *Beverly Hills Properties v. Marcolino* (1990) 221 Cal.App.3d Supp. 7, 12 [270 Cal.Rptr. 605] [affirming an award of reasonable attorney fees under Civ. Code, § 1717 for pro bono services]; see also *Lolley v. Campbell* (2002) 28 Cal.4th 367, 371 [121 Cal.Rptr.2d 571, 48 P.3d 1128] [rejecting contention that attorney fees "incurred," under a Lab. Code provision, means only fees a litigant actually pays or becomes liable to pay from his own assets; court could award fees to employee who could not afford counsel and was represented by Labor Commissioner].)[22]

Smart Inventions contends *PLCM* and other cases involving attorney fees not "actually incurred" are inapplicable because they "departed from the traditional definition of 'incurred' " for reasons, including the policies underlying Civil Code section 1717, that do not apply in this case.[23] The varying

---

[22] Smart Inventions repeatedly cites *Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259], which observed that "the usual and ordinary meaning of the words 'attorney's fees,' both in legal and in general usage, is the consideration that a litigant actually pays or becomes liable to pay in exchange for legal representation." In *PLCM*, the Supreme Court explained that its reference in *Trope* "was not intended to imply that fees can be recovered only when, and to the extent that, a litigant incurs fees on a fee-for-service basis, a question not raised therein." (*PLCM, supra,* 22 Cal.4th at p. 1097, fn. 5.) *Trope* held that an attorney who represents himself cannot recover attorney fees under Civil Code section 1717; "otherwise, we would in effect create two separate classes of pro se litigants—those who are attorneys and those who are not—and grant different rights and remedies to each." (*Trope v. Katz, supra,* 11 Cal.4th at p. 277.)

[23] Civil Code section 1717 applies to actions "on a contract," and refers to attorney fees incurred "to enforce that contract." This case is outside the ambit of section 1717 because it

reasons for these decisions, however, do not assist Smart Inventions's argument, which asks us to construe a costs statute, Code of Civil Procedure section 1033.5, as prohibiting attorney fees not actually incurred. Section 1033.5, however, applies in cases under Civil Code section 1717—which expressly states that attorney fees are an element of the costs of suit—just as it applies in this case and all other cases, whether the basis for fees is statutory or contractual.[24] In short, section 1033.5 is simply not addressed to, and cannot have any bearing on, the question whether attorney fees awarded as costs in a particular case must be "actually incurred."

Smart Inventions's second contention addresses the terms of the stock redemption agreement. As already observed, "the measure and mode of compensation of attorneys" is governed by the parties' agreement (Code Civ. Proc., § 1021), the stock redemption agreement. Smart Inventions argues the attorney fee clause of that agreement did not permit an award in excess of fees "actually incurred." It points to the use of the word "incur" in the final sentence of the attorney fee clause. That reference follows a provision stating that the court is required to determine the prevailing party "whether or not the dispute or controversy proceeds to final judgment," and states that if either party "is reasonably required to incur such out-of-pocket expenses and attorneys' fees," the prevailing party is entitled to recover them, whether or not an action is filed.

We agree with the trial court that use of the word "incur" in the final sentence of the text is not controlling. To the contrary, the attorney fee clause expressly states in its first sentence the measure of the parties' entitlement to attorney fees: "In the event of any claim, dispute or controversy arising out of or relating to this Agreement, . . . the prevailing party . . . shall be entitled to recover court costs and reasonable out-of-pocket expenses not limited to taxable costs . . . and reasonable attorneys' fees to be fixed by the court." Nothing in this language, or in the use of the word "incur" three sentences later, suggests, as Smart Inventions contends, "that the parties meant to limit fees to those the plaintiff was obligated to pay" under a contingency agreement. The entitlement language to which the parties agreed is clear: the

---

involves tort claims, not contract claims. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 615 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

[24] Attorney fees authorized by statute are, like attorney fees authorized by contract, one of the items allowable as costs under section 1033.5 (Code Civ. Proc., § 1033.5(a)(10)(B)), and subdivision (c)(1) would necessarily apply to them as well. Indeed, subdivision (c)(5) expressly states that when any state statute refers to the award of costs and attorney fees, "attorney's fees are an item and component of the costs to be awarded and are allowable as costs pursuant to subparagraph (B) of paragraph (10) of subdivision (a)." (Code Civ. Proc., § 1033.5, subd. (c)(5).)

prevailing party is "entitled to . . . reasonable attorneys' fees to be fixed by the court." Absent a clear showing—and there was none—that the parties intended this provision would not apply in the event the prevailing party had a contingency fee agreement, we decline to interpret the provision in that manner.

■ We further note that "disparity of treatment is to be avoided in interpreting and applying attorney fees provisions." (*Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 480 [65 Cal.Rptr.2d 473] [even though agreement stated that reasonable fees "may" be added to the judgment in any legal action between the parties, trial court abused its discretion in denying fees to plaintiff on the ground that under her contingent fee agreement she would not have been liable for any fees if her claim had been unsuccessful].) We discern no basis in the stock redemption agreement for restricting the trial court's discretion, clearly granted in the first sentence of the attorney fee clause, to fix reasonable attorney fees. The court would not be bound to award the full amount of a contingency fee, simply because a party was actually liable for that amount under a contingency fee agreement. (*Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 520 [198 Cal.Rptr. 725].) Similarly, the court should not be bound to award the exact amount of a contingency fee when that amount would be less than a reasonable amount for services performed. Nothing in the parties' agreement, or in the costs statutes, requires that result, and the trial court did not err when it ruled accordingly.

3. *The denial of Nokes's joinder in Smart Inventions's motion for post-section 998 offer fees and costs as untimely was erroneous.*

On January 24, 2003, Nokes served a motion requesting the trial court to determine his entitlement to an award of post-section 998 offer attorney fees, and joined in Smart Inventions's earlier motion for such fees. Nokes's motion was filed with the court on January 27, 2003. The trial court denied Nokes's motion for joinder as untimely.[25]

Nokes contends that his joinder was timely, and we agree. These are the relevant dates:

—On November 18, 2002, notice of entry of judgment was served;

---

[25] The court also indicated that even if the motion were timely, it would be denied for the same reasons the court denied Smart Inventions's motion—namely, the invalidity of the section 998 offer. (See part C.1, *ante.*)

—On December 2, 2002, Nokes filed several motions for judgment notwithstanding the verdict, as well as a motion to vacate the judgment;

—On January 13, 2003, the court denied Nokes's motions;

—On January 17, 2003, Smart Inventions filed its motion for an award of post-section 998 offer fees and costs; and

—On January 24, 2003, Nokes served and, on January 27, 2003, filed his joinder motion.

■ Rule 870.2(b)(1) of the California Rules of Court provides that a notice of motion to claim attorney fees must be "served and filed within the time for filing a notice of appeal under rules 2 and 3." Under rule 2, Nokes's notice of appeal, and therefore his notice of motion to claim attorney fees, would have been due on January 17, 2003. ■ However, under rule 3, if any party serves and files a valid motion for judgment notwithstanding the verdict and the motion is denied, the time to appeal is extended for all parties until the earliest of several dates. The relevant date in this case is "30 days after the superior court clerk mails, or a party serves, an order denying the motion or a notice of entry of that order . . . ." (Cal. Rules of Court, rule 3(c)(1)(A).) Since Nokes's time to appeal was extended under rule 3 until 30 days after the trial court's January 13, 2003 order, the same is true of his motion claiming attorney fees. (Cal. Rules of Court, rule 870.2(b)(1).) His filing on January 27, 2003 was therefore timely.

4. *Mathematical errors in the cost award must be corrected on remand.*

Nokes and Smart Inventions contend that the trial court double-counted $11,377.94 in claimed deposition costs and $614.05 in service of process costs, resulting in an excessive cost award. Persson admits the court "perhaps miscalculated the cost items attributable to Rosen," but asserts the award was within the trial court's discretion. We know of no authority for the proposition that double-counting is a matter of discretion, and direct the court to review and recalculate the items in question and make any necessary adjustments.

### DISPOSITION

The judgment against Jon Nokes is reversed to the extent it awards damages for breach of fiduciary duty, and is otherwise affirmed. The judgment against Smart Inventions on the cause of action for fraud by concealment is affirmed. The order awarding attorney fees is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

Cooper, P. J., and Flier, J., concurred.

The petitions of both respondent and appellants for review by the Supreme Court were denied April 20, 2005. George, C. J., did not participate therein.