Filed 2/9/15   Velaquez v. Koshi CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JUDITH A. VELASQUEZ, | C072767 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201000080320CUPAGDS) |
| v. | |
| ROHIN JOHN KOSHI et al., | |
| Defendants and Appellants. | |

After rejecting a statutory settlement offer of $75,000, a jury awarded a personal injury plaintiff, Judith A. Velasquez, only $18,000 in damages.  (Code Civ. Proc., § 998.)[1]  She did not move to recuse the trial judge until after the judgment was entered, yet on appeal she urges us to vacate the judgment because her trial counsel had a brief interaction as opposing counsel with the trial judge, then a lawyer, 15 years before her

_____

[1] All further statutory references are to the Code of Civil Procedure unless otherwise designated.

1

trial. During plaintiff's trial, neither the trial judge nor the trial lawyer remembered the earlier litigation. We reject plaintiff's misguided attempt to vacate the judgment by retroactively recusing the trial judge and affirm the judgment.

Defendants Rohin John Koshi and John Koshi cross-appeal the trial court's refusal to shift costs as prescribed by section 998. The question presented by the cross-appeal is whether the inclusion of the descriptor " 'with [Velasquez] and/or her attorney to satisfy any liens or encumbrances' " renders the offer too uncertain to be enforced pursuant to section 998. We conclude that it is not and reverse the trial court's orders on the parties' motions to tax costs.

## FACTS

Rohin Koshi conceded that he was at fault when he ran a red light and collided with plaintiff's automobile on July 6, 2008. He was driving a car belonging to his father, defendant John Koshi. Plaintiff, who had preexisting degenerative back disease, suffered additional injuries to her back. The primary issue at trial was the extent to which the accident exacerbated plaintiff's preexisting condition and necessitated a surgery several years later and an early retirement. But there are no issues raised on appeal related to the underlying negligence of defendant, causation, or damages. The pertinent facts relate only to the attempt to recuse the trial judge after trial and the repercussions of plaintiff's rejection of defendants' statutory settlement offer.

## I

### *The Appeal: Posttrial Motion to Vacate*

Both parties raise a host of procedural issues related to the posttrial motion to vacate the judgment because the trial court could have, and should have, been recused. We need not recite any of the underlying facts giving rise to these alleged procedural deficiencies since the notion that the judgment should be vacated because the trial court might have had some hidden residual bias from the earlier litigation with trial counsel is substantively without merit. We turn, therefore, to plaintiff's factual allegations that a

2

lawsuit involving In-N-Out Burgers 15 years before her trial compromised the trial judge's objectivity.

On September 11, 2012, the trial judge entered judgment on the jury verdict. Plaintiff filed a timely notice of appeal. The trial court thereafter issued tentative rulings on the parties' respective motions to tax costs. In his tentative ruling on defendants' motion, the court found that the section 998 offer was not fatally uncertain, notwithstanding plaintiff's argument to the contrary.

On the same day the court issued the tentative ruling, trial counsel contacted his former employer. The law firm advised counsel that he and the trial judge had been adversaries in a lawsuit in 1997. The judge, then a lawyer, represented In-N-Out Burgers. Trial counsel attended one deposition and was involved in the litigation for several months. He alleges the settlement in that case "could be viewed" as "unfavorable" to the trial judge's client and there was "contention" between them. He concedes that he had not remembered the judge was the opposing counsel in that case until members of his former law firm told him of the connection.

For the first time, plaintiff's counsel alleged the court had demonstrated animus toward him throughout the trial and in ruling against plaintiff on defendants' motion to tax costs, a position, he asserts, that was at odds with a ruling the court had made earlier in the year in an unrelated case. Plaintiff's counsel orally moved the court to take judicial notice of the previous ruling. He then made an oral motion pursuant to section 170.1 to disqualify the trial judge.

The trial court expressed his disagreement with counsel's allegations on the record. "There are just a whole host of rulings that had to do with evidentiary ruling[s] that have nothing to do with the court's feelings one way or the other. I've never met counsel before that case, have no particular feelings about the case, have no idea and had never met Judith Velasquez. I don't know [defendants' trial counsel] Mr. Winter. He's

3

never appeared in this court before. I had no knowledge of who the defendants were. [¶] . . . [¶]

". . . I have no personal knowledge of you [plaintiff's trial counsel], this case, your client, Mr. Winters or his client or any of the matters in this case." The judge denied the oral motion to disqualify himself.

A week later plaintiff's trial counsel filed a verified statement seeking to disqualify the judge from hearing any further motions, including the motions to tax costs. In addition to the facts surrounding the prior litigation, trial counsel alleged his client had suffered "disparate treatment" throughout the trial, which interfered with his ability to "meaningfully try" the case. The judge did not respond to the verified statement.

Plaintiff filed an ex parte application for reassignment of the case pursuant to section 170.3, subdivision (c)(4). The case was reassigned to another judge for resolution of the posttrial motions. The replacement judge dropped plaintiff's motion to vacate the judgment from the calendar, finding that a notice of appeal had been filed and the trial court no longer had jurisdiction to rule on the matter. Plaintiff appeals.

Defendants have no dispute with the basic principles plaintiff espouses. Disqualification is mandated if a reasonable person would entertain doubts about the judge's impartiality. (*People v. Enriquez* (2008) 160 Cal.App.4th 230, 244 (*Enriquez*).) The standard is objective; actual bias is not required. (*People v. Panah* (2005) 35 Cal.4th 395, 446 (*Panah*); *Roitz v. Caldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 723 (*Roitz*).) Because the facts are undisputed, we review the question of law de novo. (*Briggs v. Superior Court* (2001) 87 Cal.App.4th 312, 319 (*Briggs*).)

While plaintiff's principles may be sound, her application of the principles to the facts at hand is not. Nor do any of the cases she cites support the outcome she advocates. In *Panah*, *Roitz*, and *Briggs*, disqualification was not mandated under the objective reasonable person standard of evaluating impartiality. Only in *Enriquez* was

4

the case remanded to a different judge, and that was because of his "unabashed animosity toward Proposition 36, and particularly toward those defendants—like the one here—who are unable to complete Proposition 36 probation without a violation." (*Enriquez*, *supra*, 160 Cal.App.4th at p. 244.)

Indeed, in a case with facts far more susceptible to the appearance of partiality, the Supreme Court rejected a disqualification challenge. In *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*), a neutral arbitrator failed to disclose that he had been censured 15 years earlier as a trial judge for misconduct, including making sexually suggestive remarks to female staff members and creating " 'an overall courtroom environment where discussion of sex and improper ethnic and racial comments were customary.' [Citation.]" (*Id*. at p. 377.) The case before the arbitrator involved medical negligence during cosmetic lip surgery on a woman. The Court of Appeal "rejected Haworth's argument that no disclosure was required because the censure was a matter of public record. It framed the question as 'whether an " 'average person on the street' " aware of the facts would harbor doubts as to the arbitrator's impartiality.' [Citation.] The Court of Appeal concluded that because Judge Gordon was publicly censured in part for 'disparaging female associates based on their physical attributes,' 'a person aware of Judge Gordon's censure might reasonably entertain a doubt as to his ability to be impartial in a case involving a woman's cosmetic surgery.' " (*Id*. at p. 380.)

The Supreme Court reversed. Adopting a comparable federal standard, the court wrote that "the appearance-of-partiality 'standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." ' [Citation.] 'The "reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." ' [Citation.] '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective*

5

*observer* whose doubts concerning the judge's impartiality provide the governing standard.' [Citations.]" (*Haworth*, *supra*, 50 Cal.4th at p. 389.)

Plaintiff's allegation of partiality is precisely what the Supreme Court condemned—" ' "the merest unsubstantiated suggestion of personal bias" ' " by a " ' "hypersensitive or unduly suspicious" ' " " 'partisan litigant emotionally involved in the controversy.' " (*Haworth*, *supra*, 50 Cal.4th at p. 389.) In *Haworth*, the litigant could point to tangible evidence, a public censure, that the arbitrator, when serving as a trial judge, was guilty of misconduct involving sexual improprieties and innuendos. Yet the Supreme Court was unwilling to find even an appearance of partiality by a disinterested objective observer. Here plaintiff makes a raw allegation of bias based on nothing more than the fact the judge and her lawyer had been involved in a single lawsuit 15 years earlier, a fact neither the judge nor her lawyer even remembered during the entire course of the trial. We conclude that the hypothetical and ideal reasonable person, viewing the facts objectively, would entertain no doubts or suspicions that bias was festering in the recesses of the judge's subconscious.

Rather the case is somewhat analogous to *People v. Carter* (2005) 36 Cal.4th 1215, in which the Supreme Court also rejected the notion that a judge's prior professional and casual social relationship with the prosecutor gave rise to an impermissible appearance of partiality. The court appreciated the practical reality posed by the limited universe populated by judges and lawyers. "Because virtually all judges are drawn from the ranks of the legal profession, such prior relationships are neither unusual nor dispositive. (See *United Farm Workers of America v. Superior Court* [(1985)] 170 Cal.App.3d 97, 100 ['[T]he proper performance of judicial duties does not require a judge to withdraw from society and live an ascetic, antiseptic and socially sterile life. Judicial responsibility does not require shrinking every time an advocate asserts the objective and fair judge *appears* to be biased. The duty of a judge to sit where

6

not disqualified is equally as strong as the duty not to sit when disqualified.'].)" (*Carter*, at p. 1243.)

It is nearly inevitable that a trial judge will preside over trials litigated by his or her former adversaries. And certainly there may be cases in which the animosity is so intense, the feelings so raw, and the stakes so high that a judge must be recused when a former foe appears before him or her. But this is not that case. The litigation was very remote in time, having concluded 15 years before the instant case came to trial. Moreover, trial counsel was involved in the litigation for only a few months and attended one deposition where the trial judge, then a litigator, appeared. Thus, there are simply no facts to trigger a suspicion of personal animus. To the contrary, neither the judge nor the lawyer even remembered each other. If a trial judge who had a professional and social relationship with a prosecutor had an obligation to sit because she was not disqualified, then the trial judge here had a similar responsibility. In short, the mere fact that a judge and trial counsel were opposing counsel in earlier litigation does not give rise to the appearance of partiality and mandate recusal.

Plaintiff attempts to bolster her argument for retroactive recusal with anecdotes about perceived slights at trial and an adverse tentative ruling on the motion to tax costs at odds with a ruling the trial judge made on a similar motion in another case. But a judge's rulings made during a trial are not subject to attack by a posttrial motion to recuse him. Section 170.2, subdivision (b) expressly provides that "[i]t shall not be grounds for disqualification that the judge . . . [¶] . . . [¶] . . . [h]as in any capacity expressed a view on a legal or factual issue presented in the proceeding . . . ." Case law is equally clear. For example, the court in *Mackie v. Dyer* (1957) 154 Cal.App.2d 395 admonished: " 'It is well settled in this state that the expressions of opinion uttered by a judge, in what he conceives to be a discharge of his official duties, are not evidence of bias or prejudice.' [Citation.] A judge's errors on questions of law, no matter how gross, do not constitute bias or prejudice or a disqualification to proceed with the trial of the case in which the

7

errors were made. [Citations.] Erroneous rulings against a litigant, even when numerous and continuous, form no ground for a charge of bias or prejudice, especially when they are subject to review. [Citation.] A judge should not be disqualified lightly or on frivolous allegations or mere conclusions." (*Id*. at pp. 399-400.)

Similarly, " 'a trial judge will normally and properly form opinions on the law, the evidence and the witnesses, from the presentation of the case. These opinions and expressions thereof may be critical or disparaging to one party's position, but they are reached after a hearing in the performance of the judicial duty to decide the case, and do not constitute a ground for disqualification.' [Citation.]" (*Haldane v. Haldane* (1965) 232 Cal.App.2d 393, 395.)

If plaintiff believed the trial judge made legal errors at trial she was free to raise them as grounds for her appeal. She did not. His rulings, however, are not subject to collateral attack as evidence of bias once the trial is over. Nor will we examine his purported ruling in another case and assess whether it is consistent with his tentative ruling on the motion to tax costs. In the absence of a complete record of the prior motion, we have no means of assessing the relative merits of his ruling. And even if it could be determined that he erred in the prior proceeding, we would not infer that correcting the error constituted untoward bias toward plaintiff here. In sum, plaintiff cannot upset a judgment with a posttrial assessment of the trial court's rulings as evidence of a preexisting prejudice. Her contention to the contrary is without merit.

## II

### *The Cross-appeal: Cost Shifting Pursuant to Section 998*

Section 998, subdivision (c)(1) provides in relevant part: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services

8

of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." The question presented by defendants' cross-appeal is whether their $75,000 offer to settle lacked sufficient certainty to trigger section 998 penalties. Few facts are needed to resolve this question.

Almost six weeks before trial, defendants offered plaintiff a settlement pursuant to the terms of section 998. The offer included the following terms:

"1. A payment of $75,000 to plaintiff within 30 days of her signing a general release of all claims arising from or related to this action with plaintiff and/or her attorney to satisfy any lien claims or encumbrances;

"2. A dismissal of the complaint, with prejudice, to be filed upon payment;

"3. An agreement that plaintiff and defendants shall each bear their own attorneys' fees and costs."

Plaintiff did not accept the offer.

The jury returned a verdict for plaintiff awarding her $2,500 for past lost earnings, $5,500 for past medical expenses, and $10,000 for past noneconomic loss. The total award of $18,000 was $57,000 less than defendants' $75,000 offer. Both sides filed cost bills and motions to tax costs. Plaintiff sought $18,108.06 as a prevailing party pursuant to section 1032. Defendants sought $48,090.96, including expert expenses, based upon a verdict of less than the section 998 offer to settle made prior to trial.

At plaintiff's request, the trial judge did not hear the motions to tax costs. Finding that the section 998 offer was fatally uncertain and "did not trigger penalties for failure to accept" the offer, another judge awarded plaintiff $17,995.58 in costs, which included $11,037.86 in postoffer costs, and struck defendants' entire cost bill of $48,090.96.

Defendants cross-appeal. At issue is one phrase. We must determine whether the phrase "with plaintiff and/or her attorney to satisfy any lien claims or encumbrances" is

9

fatally uncertain. At the outset, we reject plaintiff's assertion that we must review the trail court's determination for a flagrant abuse of discretion.

**Standard of Review**

The cases are consistent and clear. When the facts are undisputed and the issue involves a question of law, our review is de novo. "The trial court[']s ruling as to the application of section 998, subdivision (c)(1), is reviewed de novo." (*Barnett v. First National Ins. Co. of America* (2010) 184 Cal.App.4th 1454, 1458.) "Because this issue involves the application of law to undisputed facts, we review the matter de novo." (*Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018.) "In the absence of any conflicting extrinsic evidence, interpretation of a section 998 offer is a question of law that we review de novo. [Citations.] We apply general principles of contract law where those principles neither conflict with section 998 nor defeat its purpose. [Citation.] 'We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made.' [Citation.]" (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 183-184.) "The issue of whether [a] settlement offer was sufficiently certain to be enforceable involves a question of law, which we review de novo." (*Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Elite*).)

However, a trial court's determination that a section 998 offer is reasonable and in good faith is reviewed for an abuse of discretion. (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 700 (*Elrod*).) Rather than applying basic rules of contract interpretation to determine whether the offer was sufficiently certain, a question of law, the court instead framed the question as whether the offer was reasonable in light of the certainty and clarity of the language, thereby seeking to render the court's determination a matter of discretion. As plaintiff suggests, by characterizing the determination as an exercise of discretion rather than a resolution of a question of law, we would be obligated to review the ruling for an abuse of discretion. But the cases cited to support this novel

10

conflating of the issues, which would inevitably lead to application of the wrong standard of review on appeal, are easily distinguished and do not support the court's methodology.

In *Elrod*, for example, the defendant offered the paraplegic plaintiff a $15,001 settlement offer and the jury awarded him over $1.1 million. (*Elrod*, *supra*, 195 Cal.App.3d at p. 696.) But because the defendant was entitled to a setoff for other settlements and the plaintiff's workers' compensation award, the plaintiff did not recover any monetary award from the nonsettling defendant, who promptly moved to recover all of its postoffer costs. (*Id*. at pp. 696-697.) The trial court found the offer had not been made in good faith and it was not reasonable. (*Id*. at p. 697.) There was no issue, as here, whether the offer itself was sufficiently certain and enforceable, and therefore, we quite properly reviewed the trial court's determination of reasonableness for an abuse of discretion.

Unlike *Elrod*, *Berg v. Darden* (2004) 120 Cal.App.4th 721 (*Berg*) at least involves the issue before us. Berg, like defendants, contended that his pretrial offer of settlement was sufficiently specific to satisfy the statutory requirements. The plaintiff insisted it was not. She argued that the "offer was insufficient to show that its acceptance would result in a final disposition of the underlying action, because the offer failed to indicate whether she (1) sought to have judgment entered against Darden, (2) sought to have an 'award' entered in her favor, or (3) was willing to dismiss her malpractice action with prejudice." (*Id*. at p. 728.) Providing an offeree some latitude, the Court of Appeal found the offer sufficiently certain to trigger the cost-shifting penalty.

The court explained: "So long as it is clear that the written offer of compromise is made under section 998 and, if accepted, will result in entry of judgment—the expected and standard procedural result unless specific terms and conditions stated in the offer provide otherwise—the offer need not identically track the language of the statute under which it is made. If the offeree is uncertain about some aspect of the offer, or would prefer the action be dismissed rather than have a judgment entered against him, he is free

11

to explore those matters with the offeror, or even to make counterproposals during the period in which the statutory offer remains outstanding. By doing so, he will not run the risk of having the original offer revoked and may still accept that offer on the terms extended." (*Berg*, *supra*, 120 Cal.App.4th at pp. 730-731.)

Pertinent here, the court pointed out that principles applicable to contract disputes generally also apply to section 998 offers and acceptances, but only if the contract principles neither conflict with section 998 nor defeat its purpose. (*Berg*, *supra*, 120 Cal.App.4th at p. 731.) Thus, in *Berg*, a counteroffer did not revoke a section 998 offer because that familiar contract principle would defeat the purpose of section 998 to promote settlements. But nothing in *Berg* remotely suggests that a trial court exercises discretion in applying those contract principles to undisputed facts.

Finally, citing to *Valentino v. Elliott Sav-On Gas, Inc.* (1988) 201 Cal.App.3d 692 (*Valentino*), the court concluded: "The Court is persuaded that at the time the offer was made, plaintiff could not know whether or not the offer was reasonable. The monetary terms of the offer were diluted by the value of the lien claims in a manner incapable of quantification by the Court." *Valentino* is a poor template for resolution of the real issue.

The court in *Valentino* stated the issue bluntly: "May costs be shifted against a prevailing party who rejected a settlement offer that would have required it to forego other lawsuits as well as dismissing the one involved in the case at trial?" (*Valentino*, *supra*, 201 Cal.App.3d at p. 697.) The defendant's section 998 offer required the plaintiff "to file a 'Notice of Acceptance' with the court which not only terminated the instant personal injury action against Sav-On but also released Sav-On, its attorneys and insurance carrier from any and all claims and causes of action arising out of appellant's claims including insurance bad faith and violation of Insurance Code section 790.03." (*Valentino*, at p. 695.) The court concluded that in light of this condition, "the monetary term of the offer is not really $15,000 to *settle the causes of action at issue in the instant case.* Instead that $15,000 is diluted by the worth of other present and future possible

12

causes of action Ms. Valentino must surrender in order to receive the defendant's cash." (*Id*. at p. 698.) The plaintiff and, ultimately, the trial court would have to engage in "wild speculation bordering on psychic prediction" to identify all the potential claims against the multiple defendants, some of whom had not even been named in the lawsuit, not to mention evaluating the defendants' pre- and postfiling behavior and having the clairvoyance to estimate the apparent probabilities of success on any number of possible theories. (*Id*. at p. 699.) Under such egregious circumstances, the court announced it was "not about to encourage defendants to add conditions to their statutory offers which introduce so much uncertainty to those offers the courts must spend hours or days sorting them out to determine whether plaintiffs have achieved a more favorable result at trial." (*Id*. at pp. 700-701.)

The simple condition reminding plaintiff that in signing a general release she would be liable to pay all liens and encumbrances is a far cry from releasing any and all potential claims against multiple defendants. But we need not at this juncture evaluate the merits of the issue. We raise it here only to debunk the trial court's reliance on *Valentino* to support the notion that a review of the certainty of an offer constitutes an exercise of discretion. While the court most clearly found that the offending condition was too uncertain to pass muster under section 998, the court did not hold, or even suggest, that in determining whether the offer was certain it was exercising its discretion. As a result, it does not stand for the proposition that we must review the trial court's discretion for an abuse of discretion.

**Uncertainty**

Section 998 is designed to induce pretrial settlement of cases by incentivising the parties to make and accept reasonable offers. (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 270 (*Linthicum*).) The incentive is bold—accept a reasonable offer or suffer the cost-shifting penalty if a more favorable award is not achieved. (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1170.) Nevertheless, in interpreting

13

section 998, the burden is on the offering party to demonstrate the offer is a valid one. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 799.)  "The corollary to this rule is that a section 998 offer must be strictly construed in favor of the party sought to be subjected to its operation."  (*Ibid*.)  The Supreme Court favors " 'bright line rules' " in these statutory settlement offer cases.  (*Ibid*.)

Our task is to review the section 998 offer, applying general contract principles as long as those principles neither conflict with nor defeat the statute's purpose to encourage settlement.  (*Elite*, *supra*, 119 Cal.App.4th at p. 268.)  "Under California law, a contract is enforceable if it is sufficiently definite that a court can ascertain the parties' obligations thereunder and determine whether those obligations have been performed or breached." (*Ibid*.)  "One of the cardinal rules of contract construction is that, if possible, the contract should be construed to render it valid and enforceable."  (*Linthicum*, *supra*, 175 Cal.App.4th at p. 272.)

Defendants rely on *Elite* and *Linthicum*, as well as the general rules of contract interpretation, to support their thesis that the section 998 offer was certain and enforceable.  Indeed, the authority they cite is persuasive.

The question posed in *Elite* was whether the inclusion of a reasonable attorney fee award provision in a section 998 offer renders the offer too uncertain to be enforced. (*Elite*, *supra*, 119 Cal.App.4th at p. 266.)  Similarly, the question posed in *Linthicum* was whether the offer's demand for a mutual release of all current claims between the parties makes the offer unenforceable as a matter of law.  (*Linthicum*, *supra*, 175 Cal.App.4th at p. 271.)  In both cases the plaintiffs argued, as plaintiff does here, that they could not determine the value of the offer at the time it was extended.  In *Elite*, the plaintiff contended that the inclusion of the attorney fee provision rendered the offer too uncertain to be enforced because it did not specify the amount of fees to be paid but left the amount for future determination or agreement.  (*Elite*, at pp. 268-269.)  In *Linthicum*, the plaintiff, relying on *Valentino*, insisted the value of the general release was fatally

14

uncertain. (*Linthicum*, at p. 271.) The courts rejected the notion that the inability to put a precise dollar value on these aspects of the respective offers rendered the section 998 offers unenforceable due to their uncertainty. Their rationale is equally applicable here.

Attorney fees, the court explained in *Elite*, can be determined by application of the mechanism provided by statute. "Because applicable statutory and rule provisions set forth a procedure for determining the amount of attorney fees to be awarded pursuant to a contractual provision [citation], the fact that the offer does not specify a particular amount of attorney fees does not leave the matter open for the parties' future agreement, nor does it create an uncertainty that renders it unenforceable. In this regard, a settlement offer that includes an agreement to pay reasonable attorney fees is analogous to the inclusion of an award of unspecified costs in a judgment, a very commonplace occurrence. The fact that the amount of reasonable cost (in this case, fees) must be determined thereafter does not render the offer fatally uncertain." (*Elite*, *supra*, 119 Cal.App.4th at pp. 269-270.)

A general release may or may not be too uncertain. The facts of *Valentino*, as described earlier, stand at one extreme end of the uncertainty spectrum. In *Valentino*, the offer required the plaintiff to release various potential unfiled claims the plaintiff might have had at the time the offer was made or in the future against a number of defendants, some of whom had not even been named in the lawsuit. Thus, the court held that a general release provision in a section 998 offer requiring a trial court "to engage in wild speculation bordering on psychic prediction" was fatally uncertain. (*Valentino*, *supra*, 201 Cal.App.3d at p. 699.)

But the court in *Linthicum*, taking its cue from *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899 (*Goodstein*), rejected the *Valentino* analogy. In both *Linthicum* and *Goodstein*, the section 998 offers required the plaintiffs to execute general releases of claims pertaining to the same action. In *Goodstein*, the court explained: "Inasmuch as the general release in the instant case pertained only to the same action

15

before the trial court which Bank sought to have dismissed upon its payment of $150,000 to Goodstein, *Valentino* has no application to the facts of this case." (*Goodstein*, at p. 908.) The court in *Linthicum* applied the same logic: "The release portion of the section 998 offer in *Valentino,* unlike the offer here, expressly included causes of action that were outside the scope of the litigation." (*Linthicum*, *supra*, 175 Cal.App.4th at p. 271.) The *Linthicum* section 998 offer stated: "Further, each side to bear [its] own costs and fees, with a mutual release of all current claims against one another and a mutual dismissal with prejudice of the parties' lawsuits against one another." (*Linthicum*, at p. 272.) The court concluded: "The terms costs, fees and 'mutual dismissal' are obviously limited to the instant lawsuit. There is no reason to interpret the term 'all current claims' found in the same sentence as referring to anything other than the same lawsuit." (*Ibid*.) The court upheld the validity of the offer and imposed the cost-shifting penalties. (*Ibid*.)

There is little, if anything, to distinguish the section 998 offer before us from those in *Elite*, *Linthicum*, and *Goodstein*. It too includes a general release, and no one argues that the release applies to any potential claims unrelated to plaintiff's personal injury complaint against the two defendants that are named in the complaint. Thus, *Valentino*'s rationale bears no relevance here. But if the offers in the other three cases were sufficiently certain to merit enforcement, then we have no difficulty finding there is nothing fatally uncertain about an offer including a provision making express what would otherwise be implied by the settlement—that plaintiff and/or her attorneys remain responsible for payment of the liens and encumbrances.

It is commonplace in personal injury litigation for medical providers to have liens or encumbrances against an eventual recovery by the plaintiff. And the plaintiff, who as the patient was the recipient of the services and the fees for those services, is in a position superior to an offering defendant to know the extent and value of the existing liens. Thus, to the extent a section 998 offer must be certain to allow a plaintiff to assess the value of the offer, the inclusion of the provision that the general release included a

16

directive for plaintiff and/or her attorney to pay the liens and encumbrances is nothing more than a reminder of plaintiff's obligation to pay for the medical services she received from the settlement proceeds and an express proviso that defendants would not be responsible for their payment. The provision did not add uncertainty to the offer; to the contrary, it attempted to make perfectly clear plaintiff was liable for the liens and encumbrances.

Nevertheless, in plaintiff's view the law regarding the payment of liens is too complex and too fluid to enable her or her lawyer to assess what she will have to pay to extinguish the liens. (See., e.g., *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541.) But that is a burden that must be borne by a plaintiff who has knowledge, or access to information to obtain the knowledge, about the services she has obtained and the amount of the liens or encumbrances that have accrued. To be sure, at least one court has found it to be an unreasonable burden to require a defendant to take into account the exact lien amounts when making a settlement offer. In *Culbertson v. R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, the court rejected the plaintiff's argument that the defendant's settlement offer was not reasonable in light of the workers' compensation lien. The court wrote: "Plaintiff does not cite, nor do we find, any authority holding that a defendant must take into consideration any liens pending against a possible settlement or judgment when evaluating his case for the purpose of making a settlement offer. Defendant's duty under section 998 is to make a reasonable offer under the circumstances. To hold otherwise could lead to absurd results, especially when such offer is contemplated by a liability-free defendant. For instance, assuming defendant was aware of the lien, he would have had to offer plaintiff $41,239.64 ($5,000 plus $36,239.64) to enable plaintiff to net $5,000 before costs and attorney's fees. This is an unreasonable burden to place on defendants and is contrary to the intent of the Legislature in the passage of section 998." (*Culbertson*, at p. 708.)

17

Nor did the language "plaintiff and/or her attorney" render it uncertain. Concocting a litany of far-fetched scenarios in which her lawyers might become liable for her bills, she argues the provision impeded her ability to put a dollar value on the offer. In the tentative ruling issued before his removal from the case, Judge Cadei properly disposed of plaintiff's charge the offer was uncertain because her attorney was also implicated. We adopt his succinct analysis: "Plaintiff's second contention is likewise unpersuasive. The additional requirement that Plaintiff 'and/or' her attorney satisfy 'any lien claims or encumbrances' is not ambiguous, does not expand Plaintiffs' [*sic*] duties beyond the scope of her action, does not extend to liens or encumbrances unrelated to the proposed settlement fund, and does not improperly impose upon Plaintiff's counsel a conditional duty. Instead, the provision merely restates the potential duties of Plaintiff and her counsel to faithfully discharge any existing and enforceable liens against the proposed settlement fund, which could even include satisfaction of Plaintiff's counsel's own charging lien if any. The requirement that Plaintiff recognize her primary responsibility and that of her counsel in this respect is reasonable in light of authorities that indicate that settling defendants may incur liability to potential lienors of the settlement fund if those obligations are not satisfied by plaintiff, including *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, *Siciliano v. Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745, and *Epstein v. Abrams* (1997) 57 Cal.App.4th 1159."

Plaintiff has not challenged the reasonableness of the costs incurred by defendants, nor has she argued the offer was not made in good faith. The trial court's musings on those subjects are not before us.

## DISPOSITION

The trial court's order striking defendants' memorandum of costs is reversed. In the absence of a challenge to the amount of defendants' costs, we enter judgment for defendants. We calculate the damages as a matter of law. Plaintiff's memorandum of costs was for $18,108.06, but she concedes she incurred $11,037.86 in costs after the

18

section 998 offer was made.  Her net costs are $7,070.20.  Defendants' postoffer costs are $48,090.96.  The judgment, therefore, shall be entered in favor of defendants and against plaintiff in the amount of $41,020.76.  Defendants shall recover costs on appeal.


                RAYE         , P. J.


We concur:


        BLEASE       , J.


        MAURO       , J.