Filed 12/16/24  Rahavi v. Chu CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL RAHAVI, | |
| Plaintiff and Appellant, | G063393 |
| v. | (Super. Ct. No. 30-2019-01059110) |
| MARCUS CHU et al., | |
| Defendants and Respondents. | O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David J. Hesseltine, Judge. Affirmed.

Law Offices of Stephen Abraham and Stephen E. Abraham for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Adam R. Rosenthal and Luke J. Bickel for Defendants and Respondents.

\*          \*          \*

Michael Rahavi appeals from a defense judgment in favor of Marcus Chu (Chu); Chu's wife, Tracey Chu (Tracey); Autolnk, Inc., dba Express Tire Distributor (Autolnk); and BCP Group, Inc., dba Beach City Performance (BCP Group) (collectively, Defendants). Rahavi claimed he was employed by Defendants and had not been paid wages for over two years, reimbursed for expenses incurred on behalf of the businesses, or repaid loans he had made to the businesses. Defendants argued Rahavi was not an employee, but Chu's partner in a business to grow Autolnk and BCP Group. The trial court agreed with Defendants, finding that Rahavi's monetary contributions were largely buy-ins into the partnership and not loans; his services were that of a partner, not entitled to remuneration; and any expenses paid on behalf of the partnership were not recoverable in this action because Rahavi had not made any claims against the partnership itself. On appeal, Rahavi contends the court erred because there was no evidence the partnership was a business "for profit" under Corporations Code section 16202, subdivision (a).[1] We disagree and affirm the judgment.

## FACTS

We recite only facts necessary to resolve the issues on appeal and to provide context, and we do so "in a light most favorable to [the prevailing parties at trial], resolving all conflicts in their favor." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

### I.

### THE PARTIES' DEALINGS

Chu started BCP Group and Autolnk.

---

[1] All further statutory references are to the Corporations Code.

BCP Group is a Nevada corporation doing business in California as Beach City Performance (Beach City). Beach City is a tire shop in Corona Del Mar. Beach City began in 2008 as Tire Masters. At some point it was renamed Beamer's Tire Shop, a nod to Chu's pet dog Beamer, and then later renamed Beach City. By 2012, BCP Group had been formed. In mid-2014, Beach City moved to the Corona Del Mar location, when Chu bought a commercial building for the shop.

There is only one class of stock for BCP Group, although physical shares were never issued. It is owned 90 percent by Chu and Tracey, and 10 percent by Rahavi. Its tax returns, however, never reflected ownership of shares by Rahavi.

Autolnk is a Nevada corporation doing business in California as Express Tire Distributors. It was formed in 2014 as a tech development site and later became an online e-commerce platform for tire sales. It had a warehouse in Santa Ana, California. There is only one class of stock for Autolnk, although physical shares were never issued. In February 2016, it was owned 60 percent by BCP Group, 10 percent by Rahavi, and 30 percent by others not a party to this lawsuit. Its tax returns, however, never reflected ownership of shares by Rahavi.

Chu first met Rahavi sometime between 2007 and 2010. In 2010, Rahavi began providing Chu with short-term financing of so-called "tire specials." In a nutshell, Rahavi would give Chu money for the tire shop to buy shipping containers of tires at lower than wholesale prices, and the tire shop would then resell the tires at wholesale prices. About a month after loaning Chu the cash for these tire specials, Rahavi would receive the principal amount of the loan plus typically anywhere between $5,000 to $10,000.

Sometime in 2014, Chu knew they would become business partners. Chu and Rahavi signed a "Hold Harmless Agreement," dated October 2, 2014. It stated Rahavi was "interested in investing and joint venture" with Chu to open an auto repair shop at an existing tire store in Costa Mesa. To this end, Chu agreed to let Rahavi train at Beach City, where Rahavi would "work in every phase of the shop operation" and Chu would "train [Rahavi] for free with a potential equity in future stores, where [Rahavi] will be funding or find equity partners. [Rahavi] is receiving no compensation from [Chu] or Beach City." Rahavi's "training and all business and financial disclosed [*sic*] to [Rahavi] will be confidential and not to be used or disclosed to others. [Rahavi] agree[s] to Hold Harmless Beach City Performance of any liabilities in regards to the training." Both Chu and Rahavi "mutually agree[d] to Hold each other Harmless of any liabilities, in the event a location could not be secured." In October 2014, Rahavi trained with, or "shadowed," Chu for two weeks, but the business at the Costa Mesa location never came to fruition.

In February 2016, Chu and Rahavi began a partnership—according to Chu—"to build ourselves a real estate empire and to build the automotive empire."

Chu and Rahavi signed a document, drafted by Chu's father, titled "Stock Option Agreement." It is undated, and it is unclear from the record when it was signed. It provides that "MIKE RAHAVI (MR), consultant [has] invested the sum of $250,000 for expansion (working capital & inventory purchased) for BCP Group . . . and Autolnk . . . for Stock Option to be exercise[d] within twenty four months from date of agreement." It indicates the $250,000 is for 10 percent of the company stock of Autolnk and 10 percent of the company stock of BCP Group.

The Stock Option Agreement further states (verbatim): "MR – will also be a working partner / manager for the companies – with no pay, however, will have the right to convert the salary due to stock purchase. Stock value to be determined at time of purchase[ ], determined by Income and Gross sales. [¶] MR – can also assist with credit as required for company expansion – not mandatory [¶] USE OF FUNDS – Marcus Chu is already using his personal credit to secure working capital and credit lines for the expansion of both companies. Marcus can use some of the funds to buy personal real estate and reimburse company the funds used as needed."

In February 2016, Rahavi made two payments toward the businesses totaling $70,000 and started working at the Autolnk warehouse. On June 14, Rahavi made another payment of $50,000. The next day, he made a $70,000 payment toward Beach City's purchase of Federal-branded tires. In addition to these payments, which totaled $190,000, Rahavi paid for certain expenses for the businesses.

In August 2016, Chu sent an attorney an e-mail with the subject line "Agreement with Michael Rahavi." In the e-mail, Chu stated their deal terms, which included: "We agreed Marcus [referring to himself] would take no less than [six] times Michael[']s salary which we would say is $5,000 per month to be paid in arrears so that company could use funds to grow[.] [¶] . . . [¶] We are currently trying to raise additional capital to grow the business so we have not put [M]ike on corporate paperwork[.] [¶] If we need to put the 10 percent on paper maybe we can put it as preferred stock." No signed agreement resulted from this email.

At the end of 2016, Rahavi "swapped places" with Chu and began working at Beach City. During his time at the businesses, Rahavi worked "five, six days a week" for eight hours a day. He worked from February 2016

5

to November 2018 without receiving any pay, except for a few months at the end of 2017 and start of 2018 when he took money out, as reflected in entries Rahavi made in the cash log.

In March 2018, Chu and Rahavi had a disagreement about Rahavi taking his new puppy to work. When Chu texted Rahavi not to bring the puppy to work, Rahavi responded, "don't talk to me like I'm an employee." In November 2018, Chu and Rahavi had another argument, this time in person at Beach City, and Rahavi "walked out in the middle of the day."

## II.

### THE PLEADINGS

In March 2019, Rahavi sued Defendants based on two main claims. First, Rahavi claimed he was an employee of Defendants and that Defendants had not paid him full wages for about two years. Based on this allegation, Rahavi brought causes of action for unpaid overtime wages, failure to pay minimum wages, failure to provide meal and rest periods, and failure to furnish timely and accurate wage statements (first through fourth causes of action). Second, Rahavi claimed he made various loans to and payments on behalf of Defendants for the operation of their businesses, none of which were repaid or reimbursed. Based on this allegation, Rahavi brought causes of action for breach of contract, account stated, and common counts (fifth through seventh causes of action).

Defendants denied these claims, asserting the case was really "a dispute between partners masquerading as a wage and hour case." They claimed Rahavi's involvement in the businesses was that of partner and investor, not employee. As such, Defendants argued Rahavi's entitlement to compensation was based on a partnership agreement and not subject to the Labor Code and wage orders applicable to employees.

6

Autolnk and BCP Group cross-complained against Rahavi for breach of contract. The entities alleged that they entered into an agreement with Rahavi for Rahavi to buy in and become a partner/manager in the operation of these businesses and that he breached that agreement in a variety of ways.

Nobody brought a claim to dissolve any partnership that was formed.

## III.

### THE BENCH TRIAL

The case was tried as a bench trial. At trial, Rahavi claimed that he was an employee of BCP Group and Autolnk, and that he made the following loans and expenses that were never repaid: (1) $35,000 on February 12, 2016; (2) $35,000 on February 20, 2016; (3) $50,000 on June 14, 2016; (4) $70,000 on June 15, 2016; (5) $11,000 on January 24, 2017; (6) $7,000 on October 2, 2017; (7) $35,000 on May 20, 2015, for medical expenses relating to Chu's shoulder surgery; (8) about $32,600 charged on his American Express credit card to pay business expenses, plus interest; (9) $14,600 charged on his Visa credit card to pay business expenses, plus interest; and (10) about $3,600 toward the financing of a vehicle for the businesses.

At trial, Chu testified that prior to his business relationship with Rahavi, Chu had been in at least five business partnerships with other friends and business contacts—all without written documentation of the partnership. Chu testified that Rahavi was not an employee of either Autolnk or BCP Group, but instead was a partner. Chu, however, was not entirely clear on *who* was in the partnership: "Mike and I were partners, but the partnership is with Autolnk and BCP Group. But we were still partners."

7

When asked for a description of the partnership business, Chu responded, "The Partnership just manages." He later stated "[t]he Partnership manages the companies that fix the car" and its purpose was "management, growth, expansion."

Chu testified that he and Rahavi "both managed both businesses, Autolnk and BCP [Group]. I was on Autolnk majority of the time and he was at BCP [Group] majority of the time. And we managed. [¶] And then we joined to get together and discussed both companies and where we need to get them." Rahavi was "overseeing" employees, talking to customers, quoting repair jobs, making invoices, making payroll, writing checks, and "talk[ing] to vendors about bigger deals that we were working on."

When asked what the partnership charged Autolnk and BCP Group for management services, Chu said that "[t]here was no charge." Chu confirmed the partnership did not have a bank account.

According to Chu, they agreed Rahavi was not going to be paid or draw a salary for the first year and a half, and Rahavi had said he did not "need money right now." Chu explained, "Until you make a profit, until you, until we grow, we are a small business. Working super hard to grow the business. So until we grow the business, we are not taking distributions or salary, or I don't know how you call it, draws or whatever." When the businesses were profitable, distributions were to be "basically just like a six to one. Whatever [Rahavi] took out, [Chu] would take out six times."

When asked about Autolnk and BCP Group, Chu acknowledged business practices that could be characterized as unconventional, to say the least. For example, the businesses "shared" employees—e.g., a Beach City employee would sometimes work at the Autolnk warehouse, and vice versa, but be paid only by the main business they worked for. Sometimes, workers

8

would be paid wages from petty cash, which would not be reflected in the payroll taxes. In addition, some of Autolnk's tax returns did not report having any employees.

Rahavi testified after Chu. In 2008, while Rahavi was in college for a degree in Business Management with an emphasis in Entrepreneurship, he started a series of "asset buying" companies called Newport Capital Recovery Group (NCRG), NCRG II, and NCRG III. The companies acquired discharged debt from credit card companies and banks, largely incurred during the global financial crises and recession in 2008, and sought repayment on the discharged debt. These entities bought hundreds of thousands of dollars of consumer debt for pennies on the dollar and employed a "team of lawyers" to recover on that debt.

Rahavi testified that he was never Chu's partner, and that he and his father had loaned Chu money. In February 2016, Rahavi began working as an Autolnk employee and Chu promised to pay him a salary. Rahavi explained Chu "had offered me a job to work there so I would feel more comfortable loaning him such a large amount of money." Rahavi stated that he "explicitly told [Chu] that I wasn't going to be his partner, but I felt comfortable enough to give him the money as a loan. Because he had described certain issues that I didn't want to be associated with." When asked to elaborate on those issues, Rahavi stated, "He had told me that his books and records weren't clean; did a lot of business in cash; his employees were paid under the table. And that idea of paying the employees under the table was uncomfortable for me to be associated with that." While working at the businesses, Rahavi provided loans and paid for business expenses on his personal credit cards. He explained that he stayed working for more than two

years without payment "[b]ecause [Chu] was holding my money hostage against the repayment of my father's loans."

Rahavi testified he never signed the Stock Option Agreement and that he first saw a copy of it after he sued, when it was produced in discovery. In cross-examination, Rahavi was presented with a January 2016 e-mail he sent to Chu in which he provided "deal points on our deal buying into BCP Inc.," including a "$100,000 buy in." The following colloquy occurred between Chu's counsel and Rahavi:

"Q      Well, how do you define buy-in, sir?

A      Writing a check for a hundred thousand.

Q      Is that a loan?

A      At that time, it wasn't defined.

Q      I'm asking when you wrote -- I didn't write this document, clearly. When you wrote this 'hundred thousand dollar buy-in,' that was to buy equity in BCP [Group]; that wasn't to loan money; correct?

A      It wasn't defined.

Q      I'm asking: When you wrote this document, what's your testimony, sir, as to what you meant by 'buy-in'?

A      When I wrote the document, 'buy-in' was not defined one way or the other. [¶] . . . [¶]

Q      So it's possible that we can read buy-in to mean loan?

A      You can read it however you like.

Q      How do you read it?

A      I read it as buy-in.

Q      What does that mean?

A       I've told you I don't have any particular description for it one way or the other.

Q       So buy-in could have meant something other than buying equity; is that your testimony?

A       Buy-in, to me, is writing a check for a hundred thousand.

Q       And what do you get in return for that check?

A       We never got that far." (Boldface omitted.)

A former Beach City employee testified that Rahavi had "the same role" as Chu, which was "ownership," and that "it was pretty known by everybody that worked there" that they were partners. The employee testified Rahavi's role as a partner was "payroll, overseeing the customer sales relationships, and then overseeing everybody inside the shop as well."

A Beach City customer testified Rahavi was Chu's partner at Beach City, and that each referred to the other as "his business partner."

IV.

THE TRIAL COURT'S RULING

In its written decision, the trial court stated the main issue—whether Rahavi was an employee or a partner—"largely c[ame] down to which party the court f[ound] more credible." Although the court expressed concerns about the credibility of both Chu and Rahavi, it found Chu "overall to be believable—especially in comparison to Rahavi."

The trial court found Chu "very fast and loose with how he does everything. He flies by the seat of his pants and has little concern for understanding corporate or business formalities or requirements, let alone complying with them." The court, however, credited Chu with being "honest about much of" his business practices.

11

The court "found significant portions of [Rahavi's] testimony hard to believe." The court explained: "During his testimony, Rahavi seized control of the cross-examination many times. He was aggressive and avoidant. He would redefine terms and rephrase questions. He would not admit to even simple matters that were clearly true and he had an explanation for every exhibit or piece of testimony that was inconsistent with his narrative. Everything about his demeanor and the way he conducted himself during his testimony and the trial more generally led the court to give little credibility to much of Rahavi's testimony, and find it hard to believe Rahavi' s version of events. The foregoing are just a few examples of the many reasons the court did not believe much of Rahavi's testimony."

Finally, the court found many exhibits supported Chu's testimony of the existence of the partnership, but no "credible documentation to support [Rahavi's] testimony he was an employee."

Based on the weighing of all the evidence and the evaluation of all witnesses' credibility, the trial court made the following findings. Rahavi was a partner, not an employee. Chu and Rahavi formed an unnamed partnership to manage and grow the businesses of BCP Group and Autolnk— and to make a profit. The partnership's purpose "was to expand BCP [Group] to additional locations and to grow Autolnk as a tire retailer and distributor." For a $250,000 buy-in, Rahavi was to receive ten percent of both BCP Group and Autolnk and could increase his share through sweat equity and additional contributions. Rahavi made a total equity contribution of $190,000. Between February and June 14, 2016, Rahavi contributed $120,000 toward his buy-in. And on June 15, Rahavi made another $70,000 equity contribution in connection with the large purchase of Federal tires. Chu testified Rahavi had a ten percent interest, even though he didn't contribute

the full $250,000. The parties agreed to share profits or distribution on a six-to-one ratio, with Chu receiving the greater amount. In sum, the trial court found that "based on the parties' words, conduct, and agreements, . . . Chu and Rahavi associated together to carry on as co-owners of a business for profits and formed a partnership." The court clarified, "BCP [Group] and Autolnk were not the partnership, but rather their management, operation, and growth were the subject and purpose of the partnership between Chu and Rahavi."

The court addressed Rahavi's arguments, including that there were no partnership filings or bank accounts, that BCP Group and Autolnk could not be partnerships because they were corporations, and that the purported partnership was not compensated for management services it allegedly rendered. It stated: "[W]hen persons join together to do business and do not satisfy the requirements for other forms of a business entity, such as a corporation, they form a partnership, and the court finds that is what the parties intended here. Chu's and the partnership's failure to make any filings, report income, and comply with various other requirements may subject them to liability or have other consequences, but it does not defeat the formation of the partnership the parties intended. Indeed, having intended to form a partnership, Rahavi cannot exploit the parties' failures (including his own) to follow formalities and now claim there was not partnership and he is entitled to hundreds of thousands of dollars in back wages."

Given the trial court's finding Rahavi was a partner and not an employee, the court found against Rahavi on his wage claims (first through fourth causes of action). The court also found against Rahavi on his contract claims (fifth through seventh causes of action). The court found Rahavi loaned $35,000 in May 2015, but that Chu had repaid it. As for all other

13

money paid by Rahavi, the court found that either they were not loans or that Rahavi had failed to show they were loans subject to repayment, that most constituted equity buy-ins, and that some were expenses personally incurred by Rahavi as a partner in connection with the management and operation of the businesses. Concerning the expenses incurred as a partner, the court acknowledged Rahavi may have a claim for reimbursement against the partnership but that he did not bring any claims *in this action* against the partnership.

On the cross-complaint for breach of contract, the trial court found against BCP Group and AutoInk because they failed to prove the existence of any agreement between them and Rahavi (as opposed to Chu and Rahavi).

Rahavi timely appealed the judgment.

DISCUSSION

The sole issue Rahavi raises on appeal is whether the trial court erred by finding the existence of a partnership between him and Chu. According to Rahavi, the court erred because there was no evidence the alleged partnership engaged in a business "for profit." Rahavi argues that because the alleged partnership did not charge for its services, it was not engaged in a business "for profit" and thus cannot meet the definition of partnership under section 16202. We disagree.

Generally, a partnership is formed when at least two persons associate "to carry on as coowners a business for profit . . . , whether or not the persons intend to form a partnership." (§ 16202, subd. (a).) An association organized as another entity (e.g., a corporation) is not a partnership. (§ 16202, subd. (b).) "[T]he existence of a partnership is a question of fact" to be determined from the parties' agreement, their conduct, and the

14

surrounding circumstances. (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1157 (*Persson*).) A partnership agreement can be "written, oral, or implied." (§ 16101, subd. (a)(10).) "'In that sense, any partnership without a written agreement is a "de facto" partnership.'" (*Eng v. Brown* (2018) 21 Cal.App.5th 675, 694 (*Eng*).) The actual sharing of profits is "evidence of a partnership, rather than a required element of the definition of a partnership." (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 454, fn. omitted.)

We review the trier of fact's determination on whether a partnership exists for substantial evidence. (*Cochran v. Board of Supervisors* (1978) 85 Cal.App.3d 75, 81.) "Where an appellant argues that a particular verdict is not supported by [substantial] evidence, our review '*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination.'" (*DeNike v. Mathew Enterprises, Inc.* (2022) 76 Cal.App.5th 371, 381.) "The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable." (*Ibid.*) However, "[t]he proper interpretation of a statute, and its application to undisputed facts, presents a question of law that is subject to de novo review." (*Compulink Management Center, Inc. v. St. Paul Fire & Marine Ins. Co.* (2008) 169 Cal.App.4th 289, 295.)

Here, the trial court found Chu and Rahavi entered into a partnership with the purpose of managing, operating, and growing Autolnk and BCP Group. Unless they agree otherwise, partners typically are not compensated for their services, on the theory that their contributions offset each other. (*Vangel v. Vangel* (1953) 116 Cal.App.2d 615, 631; see also § 16401, subd. (h) [unless the agreement provides otherwise, "[a] partner is

15

not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership"].) The court found the two men agreed to share profits or distribution from the companies on a six-to-one ratio, with Chu receiving the greater amount. The court also found it difficult to believe Rahavi would continue to contribute significant sums of money to the businesses when he was not receiving any of the wages he claims he was entitled to as part of the arrangement. These findings are amply supported by Chu's testimony and trial exhibits, including the Stock Option Agreement.

We are not persuaded by Rahavi's interpretation that, to constitute a partnership under section 16202, the partnership itself must generate the "profit," as opposed to generating profit for a related entity in which the partners will reap the profit. All that is required for a partnership is coownership of "a business for profit." (§ 16202, subd. (a).) Nothing in the statutory language compels that the business itself make the profit, and Rahavi does not cite any case law that directly supports his position.

Ordinarily, "a partnership does not continue to exist after the formation of a corporation." (*Persson*, *supra*, 125 Cal.App.4th at p. 1157.) "[A]fter a partnership is incorporated, the rights or obligations which partners can enforce against each other no longer exist. . . . They have the rights and obligations of shareholders, not partners . . . ." (*Id.* at p. 1159.) But this rule is subject to an exception: "a pre-incorporation agreement or evidence the corporate form was disregarded." (*Ibid.*) "Partners may, by agreement, continue their relations as copartners in conjunction with their relationship as stockholders of a corporation, and 'the law [will] take cognizance of such dual relationship and deal with "the parties in the light of their agreement . . . , independently of their incorporation" . . . .' [Citations]."

16

(*Id.* at p. 1158; see also *Eng, supra,* 21 Cal.App.5th at pp. 695–696 [proponent of the partnership may "offer[ ] evidence that the partners intended to retain their partnership notwithstanding incorporation"]; *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354, 359–362, 368 [plaintiff, who with defendant had formed joint venture that was later incorporated, allowed to personally sue defendant for breach of fiduciary duty under original joint venture for usurping corporate opportunities].) For this reason, the trial court could reasonably find a partnership between Chu and Rahavi, notwithstanding the corporate status of Autolnk and BCP Group.

In sum, we conclude the court did not err in finding the existence of a partnership between Chu and Rahavi.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


DELANEY, J.

WE CONCUR:


MOORE, ACTING P. J.


GOODING, J.